# COOK *v.* UNITED STATES.

ERROR TO THE CIRCUIT COURT· OF THE UNITED STATES FOR THE EASTERN DISTRICT OF TEXAS.

No. 1311. Argued December 11, 12, 1890. — Decided January 26, 1891.

By the act of March 1, 1889, 25 Stat. 783, c. 333, " to establish a United States court in the Indian Territory, and for other purposes," the strip of public land lying south of Kansas and Colorado, and between the one hundredth and the one hundred and third meridians, and known as No Man's Land, was brought within the jurisdiction of the court for the Indian Territory so established, and was attached for limited judicial purposes to the Eastern District of Texas.

The history of and the legislation concerning the Indian Territory considered and reviewed.

By the act of March 1, 1889, 25 Stat. 783, c. 333, the intention of Congress to confer upon the Circuit Court of the United States in the Eastern District of Texas power to try defendants for the offence of murder, committed before its passage, where no prosecution had been commenced, was so clearly expressed as to take it out of the well settled rule that a statute should not ·be interpreted to have a retroactive operation where vested rights are injuriously affected by it; and it must be construed as operating retroactively.·

The provision in Article 3 of the Constitution of the United States as to crimes " not committed within any State " that " the trial shall be at such place or places as the Congress may by law have directed " imposes no restriction as to the place of trial, except that the trial cannot occur until Congress designates the place, and may occur at any place which shall have been designated by Congress previous to the trial; and it is not infringed by the provision in the act of March 1, 1889, 25 Stat. 783, c. 333, conferring jurisdiction upon the Circuit Court in the Eastern District of Texas to try defendants for the offence of murder committed before its passage.

The Sixth Amendment to the Constitution, providing for the trial in criminal prosecutions by a jury " of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law," has reference only to offences against the United States committed within a State, and is not infringed by the act of March 1, 1889, 25 Stat. 783, c. 333.

The act of March 1, 1889, 25 Stat. 783, c. 333, although it subjects persons charged with murder committed in a place under the exclusive jurisdiction of the United States, but not within any State, to trial in a judicial district different from the one in which they might have been tried at

the time the offence was committed, is not repugnant to Art. I, Sec. 9 of
the Constitution of the United States as an *ex post facto* law; since an *ex
post facto* law does not involve, in any of its definitions, a change of the
place of trial of an alleged offence, after its commission.

The Circuit Court of the United States for the Eastern District of Texas,
held at Paris, in that District, at the October Term, in 1889, had juris-
diction of an indictment for murder, charged to have been committed in
the country known as "No Man's Land" July 25, 1888.

The Attorney General having, by his brief, confessed, as it was his duty to
do, that there was error in an important ruling in the court below,
entitling the defendants to a reversal, this court reverses the judgment
of that court, and remands the case for a new trial.

THERE was, in July, 1888, a parallelogram of unorganized
public land extending from the 100th meridian on the east
to the 103d on the west, and from latitude 36° 30' to latitude
37°. It was called "Public Land" upon the maps, but was
commonly known as "No Man's Land." It was originally
a part of the Republic of Texas; but, in the annexation, the
parallel of 36° 30' was made the northerly line of the State,
presumably in order to apply the rule of the Missouri Com-
promise. Kansas and Colorado were subsequently organized,
in part out of this acquired territory north of 36° 30', with
their southern boundaries on the 37th parallel; the west line
of the Indian Territory was fixed at the 100th meridian; and
the eastern boundary of New Mexico was fixed on the 103d
meridian, thus leaving this small strip of land not included in
any organized State or Territory.

By the act of March 1, 1889, 25 Stat. 783, c. 333, it was
provided that "a United States court is hereby established
whose jurisdiction shall extend over the Indian Territory
bounded as follows, to wit: north by the State of Kansas,
east by the States of Missouri and Arkansas, south by the
State of Texas, and west by the State of Texas and the Ter-
ritory of New Mexico." It will be seen that the Indian Ter-
ritory as thus defined on the west stretches to the border of
New Mexico. To do this its northern line must run upon a
portion of the southern line of Colorado. But Colorado is not
mentioned in the act; only Kansas.

Under the provisions of the 17th section of that act it was

provided that this part of the Indian Territory should "from and after the passage of this act be annexed to and constitute a part of the Eastern Judicial District of the State of Texas for judicial purposes." p. 786.

By the act of May 2, 1890, 26 Stat. 81, c. 102, this parallelogram was made a part of the Territory of Oklahoma; but by section 9 of that act it was provided that crimes committed therein "prior to the passage of this act shall be tried and prosecuted and proceeded with, until finally disposed of, in the courts now having jurisdiction thereof, as if this act had not been passed." 26 Stat. 86.

The plaintiffs in error were, at October term, 1889, of the Circuit Court of the United States for the Eastern District of Texas, sitting at Paris in that State indicted for murder committed in No Man's Land. The allegations in the indictment were as follows:

"Eastern District of Texas, ss. : The grand jurors of the United States of America, duly elected, impanelled, tried, sworn and charged to inquire into and due presentment make of offences against the laws of the United States of America in and for the district and circuit aforesaid, on their oath in said court present: That heretofore, to wit, on the twenty-fifth day of July in the year of our Lord one thousand eight hundred and eighty-eight, in that section of the country lying between Kansas and Texas, bounded on the west by New Mexico, and extending east to the hundredth meridian of longitude, commonly called the Neutral Strip or 'No Man's Land,' in the Indian Territory, the same being attached to and constituting part of the Eastern District of Texas for judicial purposes, and within the jurisdiction of this court," etc. — (then charging the homicide).

The trial, at which various exceptions to the ruling of the court were duly taken, resulted in conviction and sentence, to review which this writ of error was brought. Several assignments of error were made, but the only ones considered by this court were those which related to the jurisdiction of the court below, and the following:

"*Tenth.* The court erred in permitting the counsel for the

government to read from the report of Attorney General Bradford in the hearing of the jury certain statements, then to ask the witness Bradford if he did not make the statements so read in said report, and in overruling the objections of plaintiffs in error thereto. And the court erred in admitting in evidence, over the objections of plaintiffs in error, certain parts of said report, as shown of record, because said witness Bradford was placed upon the witness stand by the government as a rebutting witness after counsel for government knew what he would testify to, and said witness had testified as such rebutting witness to the exact facts that the government's counsel had expected him to testify to; and because said witness had stated that plaintiff in error, C. E. Cook, did not state to him in language or in substance the statement contained in said report; because what witness stated in said report was not a report required of him in his official capacity as Attorney General of the State of Kansas. Neither said report nor any part thereof was relevant or competent, and is hearsay, and ought not to have been admitted in evidence."

*Mr. George R. Peck* and *Mr. John F. Dillon*, (with whom were *Mr. William R. Day*, *Mr. Joseph Frease* and *Mr. W. H. Rossington*, on the brief,) for plaintiffs in error, made the following points upon the question of jurisdiction:

The Circuit Court of the United States for the Eastern District of Texas had no jurisdiction of the offence charged in the indictment for the following distinct reasons:

(1) The Neutral Strip or "No Man's Land" at the date of the homicide alleged in the indictment (July 25, 1888) was outside of the jurisdiction of any particular state or federal district; and no court of the United States had jurisdiction to prosecute criminally the alleged homicide; or, if any court had jurisdiction, it was not the Circuit Court for the Eastern District of Texas, but was the district where the defendants were found or arrested.

(2) The allegation in the indictment on which the court below assumed jurisdiction, viz., that on the 25th day of July,

1888, the Neutral Strip or "No Man's Land" was "in the Indian Territory, the same being attached to and constituting part of the Eastern District of Texas for judicial purposes, and within the jurisdiction of this court," is untrue in point of fact and of law.

(3) If "No Man's Land" was, at the date of the commission of the alleged homicide (July 25, 1888), within or attached to any judicial district of the United States, it was the *Northern* District of Texas and not the Eastern District of Texas.

(4) The Circuit Court of the United States for the Eastern District of Texas assumed jurisdiction by virtue of sec. 18 of the act of March 1, 1889, 25 Stat. 786. If this act operated to extend the jurisdiction of that court to offences committed in No Man's Land, it did so only as to offences committed after the approval of that act. It could not, under the Constitution, make a past offence triable in the district created by that act instead of the district which existed when the offence was committed; nor could the act be made retrospective, so as to embrace an offence committed before its passage.

The legislation bearing upon these propositions is as follows:

*Indian Territory.* 4 Stat. 729, c. 161; 5 Stat. 680, c. 103; 16 Stat. 362, c. 296, § 12; 18 Stat. 51, c. 205; 18 Stat. 420, c. 132; 19 Stat. 176, c. 289; 19 Stat. 254, c. 72; 19 Stat. 272, c. 101; 19 Stat. 323, c 103; 19 Stat. 338, c. 103; 19 Stat. 356, c. 105; 22 Stat. 405, c. 13; 25 Stat. 783, c. 333.

*No Man's Land:* 5 Stat. 797, Resolution No. 8; 9 Stat. 446, c. 49; 4 Stat. 729, c. 161; 5 Stat. 680, c. 103; 19 Stat. 230, c. 41; 22 Stat. 400, c. 13; 20 Stat. 318, c. 97; 25 Stat. 783, c. 333.

On this legislation we submit that it is entirely clear that the allegations in the indictment that the Neutral Strip or "No Man's Land" was, on July 25, 1888 (the date of the homicide), in the "Indian Territory," and that the same was attached to and constituted part of the *Eastern* Judicial District of Texas, are, and each of those allegations is, wholly without foundation. On the contrary, it appears from the foregoing legislation that on the 25th of July, 1888, "No

Man's Land" was no part of the Indian Territory, and was not at that time situate in or annexed to any judicial district of the United States. It was not part of the Indian Territory, or part of the Indian Country, as it stood annexed by the acts of 1834 and 1844, noticed above, to the District of Arkansas, and it was no part of the "Indian Territory," as it was by the act of January 31, 1877, annexed by the then well known name, "Indian Territory," to the Western District of Arkansas; it was not part of the "Indian Territory" within the meaning of the act of January 6, 1883, which divided the jurisdiction over the Indian Territory between Kansas and the *Northern* District of Texas. The result is, that it was not, on July 25, 1888, the date of the alleged homicide, part of any judicial district. If this be so, the conclusion necessarily follows that the Circuit Court for the Eastern District of Texas had no jurisdiction.

But we contend further that no federal court has jurisdiction.

The Constitution of the United States provides (Sec. 2, Art. III,) that when crimes are not committed within any State "the trial shall be at such place or places as the Congress may by law have directed." This means that the place or places of trial must have been directed by Congress by statute prior to the commission of the offence.

Section 730 of the Revised Statutes provides that the trial of all offences committed on the high seas or elsewhere, out of the jurisdiction of any particular state or district, shall be in the district where the offender is found, or into which he is first brought. It has been held that this refers only to maritime offences, and not to offences committed on land. *United States* v. *Alberty*, Hemp. 444. And in *Ex parte Bollman*, 4 Cranch, 75, it was held that if an offence be committed on land, the offender must be tried by the court having jurisdiction over the territory where the offence was committed.

We therefore submit that "No Man's Land" was on July 25, 1888, the date of the alleged homicide, no part of any judicial district, and that Congress had not previously to that time prescribed any place for the trial of offences committed

within that region; and that, under the Constitution, Congress could not, if it had undertaken to do so (which it did not), afterwards prescribe a place of trial. Such act would not only be in conflict with Sec. 2, Art. III, of the Constitution, above referred to, but would also be *ex post facto* within the meaning of the Constitution, as is shown by the decision and reasoning in *Kring* v. *Missouri*, 107 U. S. 221.

But if we are mistaken in this, and if section 730 of the Revised Statutes does apply to offences committed on land, outside of any particular State or district, then the distinct provision is that the trial "shall be in the district where the offender is found, or into which he is first brought;" and that fact ought to be alleged in the indictment; certainly in some proper mode to appear of record. Such allegation in the indictment would seem to be necessary in order to show that the crime is within the limited jurisdiction of the particular federal court. In point of fact the defendants were residents of and were arrested in, Kansas, and applied to Mr. Justice Brewer to be released on habeas corpus. *In re Jackson*, 40 Fed. Rep. 372.

We have thus far considered the question on the hypothesis that at the time the homicide was committed, No Man's Land was within no judicial district. But if we are mistaken in this position, then it belonged, if to any, to the *Northern* District of Texas by virtue of the act of January 6, 1883, 22 Stat. 400, c. 13. The result would be that the *Eastern* District of Texas would have no jurisdiction; and, confessedly, it has none, except it is conferred by the eighteenth section of the act of March 1, 1889, 25 Stat. 783, which was passed after the date of the alleged homicide.

Nothing seems to us to be plainer than that the act of 1889 does not undertake to give any jurisdiction to the Circuit Court for the Eastern District of Texas as to past offences. The only language relating to jurisdiction is the following: "And the United States Courts herein provided to be held at Paris shall have exclusive original jurisdiction of all offences against the laws of the United States within the limits of that portion of the Indian Territory attached to the Eastern Judi-

cial District of the State of Texas by the provisions of this
act," et cet.

There is no reason to suppose that Congress in the use of
the words that the "Court herein provided to be held at Paris
shall have exclusive original jurisdiction of all offences against
the laws of the United States," meant to refer to past offences.
There is not the slightest evidence or indication of any such
intention to be found in the act. The ordinary principles of
construction apply, namely, that a statute shall have a pro-
spective operation only, unless in clear terms it is given a
retrospective operation.

It is a sound rule of construction that a statute should have
a prospective operation only, unless its terms show clearly a
legislative intention that it should operate retrospectively.
*Chew Heong* v. *United States*, 112 U. S. 536; *United States*
v. *Starr*, Hemp. 469.

But if the act of March 1, 1889, 25 Stat. 783, shall be
construed to be retrospective, and to have been intended to
apply to offences committed in "No Man's Land" prior to
the passage of that act, the said act is void because in con-
flict with Sec. 2, Art. III, of the Constitution, for the reason
that Congress had no power to fix or change the district in
which the trial should be had after the commission of the
offence.

This section provides that in the States crimes shall be
prosecuted within the States where committed, and when the
crime is committed without the States the trial shall be at
such place or places as the Congress may by law have directed.
When introduced the last clause read as follows: "As the
legislature may direct." It was changed so as to read "as the
Congress may by law have directed."

The object of this provision is plain. It was intended to
secure to the accused a trial by jury in the place where the
crime was committed. If Congress might fix the place of
trial after the commission of an offence it could provide for
trial in a district remote from the residence of the accused, at
such a distance from the witnesses as to deprive him of their
presence and testimony. All such attempts are rendered void

by the constitutional provisions above quoted. *United States*
v. *Maxon*, 5 Blatchford, 360; *Gut* v. *The State*, 9 Wall. 35, 37;
*Ex parte Devoe M'f'g Co.*, 108 U. S. 401, 417.

*Mr. Attorney General* and *Mr. Solicitor General* for defend-
ants in error. Their brief contained the following paragraphs,
entitled "Confession of error."

The admission of the report of the Attorney General of
Kansas upon the murder, and the charge of the court to the
jury with respect to the effect thereof, were error prejudicial
to the defendants below. . . .

It will be seen from the foregoing that the government was
permitted to contradict its own witness by introducing a writ-
ten statement signed by him, made at another time, and that
this was done without any professional statement to the court
by counsel for the government that they were surprised and
misled into calling him. Such a course is contrary to all the
rules of evidence. . . . It is not necessary to discuss the
question whether the charge was erroneous. It was grossly so,
and must have been very prejudicial. It was the admission
of the purest hearsay evidence upon the crucial point in the
case.

Mr. Justice Harlan delivered the opinion of the court.

The plaintiffs in error, with others, were indicted in the
court below at its October term, 1889, and were convicted and
sentenced to suffer death, for the crime of murder alleged to
have been committed on the 25th day of July, 1888, in that
part of the United States designated in numerous public doc-
uments as the Public Land Strip, but commonly called No
Man's Land. It is 167 miles in length, 34½ miles in width,
lies between the 100th meridian of longitude and the Territory
of New Mexico, and is bounded on the south by that part of
Texas known as the Panhandle, and by Kansas and Colorado
on the north.

The prosecution was based upon section 5339 of the Revised
Statutes, providing that " every person who commits murder

within any fort, arsenal, dock-yard, magazine or in any other place or district of country under the exclusive jurisdiction of the United States, . . . shall suffer death;" and upon the act of Congress of March 1, 1889, establishing a court of the United States for the Indian Territory and for other purposes, and attaching a part of that Territory, for limited judicial purposes, to the Eastern District of Texas. 25 Stat. 783, c. 333.

The principal assignment of error is based upon these general propositions: That at the date of the alleged homicide the Public Land Strip was not within the jurisdiction of any particular state or federal district, and that no court of the United States had jurisdiction to try the alleged offence, or if any court had jurisdiction it was not the court below, but the Circuit Court of the United States for the Northern District of Texas, or that of the District of Kansas in which the defendants were found and arrested; and that if the above act of March 1, 1889 — under which alone this prosecution was conducted — placed the Public Land Strip within the limits of the Eastern District of Texas, it did not, and consistently with the Constitution of the United States could not, give the Circuit Court for that district jurisdiction of offences committed prior to its enactment.

Did Congress intend to attach the Public Land Strip to the Eastern District of Texas for any purpose? That necessarily is the question to be first considered. And it must be determined without reference to the act of May 2, 1890, providing a temporary government for Oklahoma; for that act, while including this strip within the Territory of Oklahoma, declares that all "crimes committed in said Territory" prior to its passage "shall be tried and prosecuted, and proceeded with until finally disposed of, in the courts now [then] having jurisdiction thereof," as if that act had not been passed. 26 Stat. 81, 86, c. 182, §§ 1, 9. We shall be aided in the solution of the question of jurisdiction by recalling the history of the Public Land Strip, and various acts of Congress, preceding that of 1889, which are supposed to have some bearing upon this case.

The Public Land Strip was once a part of the possessions of

Mexico. This appears from the treaty of January 12, 1828, between the United States of America and the United Mexican States, confirming the previous treaty of February 22, 1819, with the Monarchy of Spain. 8 Stat. 372, 374. When Texas achieved its independence this strip was within its limits. Indeed, the Republic of Texas originally embraced the present territory of the State of Texas, as well as parts of what. now constitutes New Mexico, Arizona, Colorado and Kansas. On the day of its admission into the Union, by the Joint Resolution of December 29, 1845, the judicial District of Texas was established, embracing the entire State. 9 Stat. 1, 108.

Congress, by an act of September 9, 1850, 9 Stat. 446, c. 49, made certain propositions to Texas, one of which was that its boundary on the north should commence at the point where the meridian of one hundred degrees west from Greenwich is intersected by the parallel of thirty-six degrees thirty minutes north latitude, and run from that point due west to the meridian of one hundred and three degrees; thence due south to the thirty-second degree of north latitude; thence on the latter parallel to the Rio Bravo del Norte; and thence with the channel of that river to the Gulf of Mexico. This proposition was accepted by Texas. Oldham and White's Digest Laws of Texas, p. 55. By the same act, § 2, the eastern boundary of New Mexico was established on the one hundred and third meridian. The remaining territory of Texas, as it was when admitted into the Union, passed by that act under the jurisdiction of the United States. The Territory of Kansas was organized by the act of May 30, 1854, c. 59, § 19, 10 Stat. 277, 283, its southern line being fixed on the 37th parallel of north latitude. The Territory of Colorado was organized by an act approved February 28, 1861, 12 Stat. 172, c. 59, its eastern boundary being on the 102d meridian, and its southern boundary being on the 37th parallel of north latitude. Ib. § 1. The result of all these enactments was that the body of public lands, known as the Public Land Strip, was left outside of Texas as well as of the Territories of New Mexico, Kansas and Colorado.

By the act of February 21, 1857, the State of Texas was divided into two judicial districts, the Western and the Eastern. 11 Stat. 164, c. 57. The Northern District was established by an act passed February 24, 1879, with courts at Waco, Dallas County, and Graham, Young County, embracing one hundred and ten counties by name, including Sherman, Hansford, Ochiltree and Lipscomb in the panhandle, immediately south of the Public Land Strip, and Hemphill, Wheeler, Collingsworth and Childress immediately west of the 100th meridian, and Hardeman, Wilbarger, Wichita, Clay, Montague, Cooke, Grayson, Fannin and Lamar immediately south of the Indian Territory, in the central and eastern parts of Texas, but excluding the counties of Red River and Bowie in the latter State near the Arkansas line. The same act enlarges the Eastern District of Texas, and designates all the counties that should thereafter compose the Eastern and Western Districts, respectively. Under this act the Eastern District embraced, among others, the counties next to Louisiana and Arkansas, including Red River and Bowie. 20 Stat. 318, c. 97.

An act of Congress was passed January 6, 1883, for the holding at Wichita of a term of the District Court of the United States for the District of Kansas and for other purposes, 22 Stat. 400. c. 13. By that act (§ 2) "all that portion of the Indian Territory lying north of the Canadian River and east of Texas and the one hundredth meridian not set apart and occupied by the Cherokee, Creek and Seminole Indian tribes," was annexed to the District of Kansas; and the United States District Courts at Wichita and Fort Scott in that district were given " exclusive original jurisdiction of all offences committed within the limits of the territory hereby annexed to said District of Kansas against any of the laws of the United States now or that may hereafter be operative therein." It was further provided: "§ 3. That all that portion of the Indian Territory not annexed to the District of Kansas by this act, and not set apart and occupied by the Cherokee, Creek, Choctaw, Chicasaw and Seminole Indian tribes, shall, from and after the passage of this act, be annexed to and con-

stitute a part of the United States judicial district known as the Northern District of Texas; and the United States District Court at Graham, in said Northern District of Texas, shall have exclusive original jurisdiction of all offences 'committed within the limits of the territory hereby annexed to said Northern District of Texas against any of the laws of the United States now or that may hereafter be operative therein. § 4. That nothing contained in this act shall be construed to affect in any manner any action or proceeding now pending in the Circuit or District Court for the Western District of Arkansas, nor the execution of any process relating thereto; nor shall anything in this act be construed to give to said District Courts of Kansas and Texas, respectively, any greater jurisdiction in that part of said Indian Territory so as aforesaid annexed, respectively, to said District of Kansas and said Northern District of Texas, than might heretofore have been lawfully exercised therein by the Western District of Arkansas; nor shall anything in this act contained be construed to violate or impair, in any respect, any treaty provision whatever." It is insisted, on behalf of the United States, that this act attached the Public Land Strip to the Northern District of Texas; that the words, "Indian Territory," were used to include that strip; and that such a construction is sustained both by executive recognition and by the legislation of Congress.

Then comes the act of March 1, 1889, c. 333, above referred to, 25 Stat. 783, which, it is contended, transferred the Public Land Strip from the Northern District to the Eastern District of Texas. By its first section a United States Court, to be held at Muscogee, is established, "whose jurisdiction shall extend over the Indian Territory, bounded as follows, to wit: North by the State of Kansas, east by the States of Missouri and Arkansas, south by the State of Texas, and west by the State of Texas and the Territory of New Mexico." It is given (§ 5) "exclusive original jurisdiction over all offences against the laws of the United States committed within the Indian Territory as in this act defined, not punishable by death or by imprisonment at hard labor." That court was

also given (§ 6) " jurisdiction in all civil cases between citizens of the United States who are residents of the Indian Territory, or between citizens of the United States, or of any State or Territory therein, and any citizen of or person or persons residing or found in the Indian Territory, and when the value of the thing in controversy, or damages or money claimed shall amount to one hundred dollars or more: *Provided*, That nothing herein contained shall be so construed as to give the court jurisdiction over controversies between persons of Indian blood only."

The seventeenth, eighteenth and twenty-eighth sections of that act are as follows:

" SEC. 17. That the Chickasaw Nation and the portion of the Choctaw Nation within the following boundaries, to wit : Beginning on Red River at the southeast corner of the Choctaw Nation; thence north with the boundary line between the said Choctaw Nation and the State of Arkansas, to a point where Big Creek, a tributary of the Black Fork of the Kimishi River, crosses the said boundary line; thence westerly with Big Creek and the said Black Fork to the junction of the said Black Fork with Buffalo Creek; thence northwesterly with said Buffalo Creek to a point where the same is crossed by the old military road from Fort Smith, Arkansas, to Boggy Depot, in the Choctaw Nation; thence southwesterly with the said road to where the same crosses Perryville Creek; thence northwesterly up said creek to where the same is crossed by the Missouri, Kansas and Texas Railway track; thence northerly up the centre of the main track of the said road to the South Canadian River; thence up the centre of the main channel of the said river to the western boundary line of the Chickasaw Nation, the same being the northwest corner of the said nation; thence south on the boundary line between the said nation and the reservation of the Wichita Indians; thence continuing south with the boundary line between the said Chickasaw Nation and the reservations of the Kiowa, Comanche and Apache Indians to Red River; thence down said river to the place of beginning; and all that portion of the Indian Territory not annexed to the District of

Kansas by the act approved January sixth, eighteen hundred and eighty-three, and not set apart and occupied by the five civilized tribes, shall, from and after the passage of this act, be annexed to and constitute a part of the Eastern Judicial District of the State of Texas, for judicial purposes.

"SEC. 18. That the counties of Lamar, Fannin, Red River and Delta of the State of Texas, and all that part of the Indian Territory attached to the said Eastern Judicial District of the State of Texas by the provisions of this act, shall constitute a division of the Eastern Judicial District of Texas; and terms of the Circuit and District Courts of the United States for the said Eastern District of the State of Texas shall be held twice in each year at the city of Paris, on the third Mondays in April and the second Mondays in October; and the United States courts herein provided to be held at Paris shall have exclusive, original jurisdiction of all offences committed against the laws of the United States within the limits of that portion of the Indian Territory attached to the Eastern Judicial District of the State of Texas by the provisions of this act, of which jurisdiction is not given by this act to the court herein established in the Indian Territory; and all civil process, issued against persons resident in the said counties of Lamar, Fannin, Red River and Delta, cognizable before the United States courts, shall be made returnable to the courts, respectively, to be held in the city of Paris, Texas. And all prosecutions for offences committed in either of said last-mentioned counties shall be tried in the division of said eastern district of which said counties form a part: *Provided,* That no process issued or prosecution commenced or suit instituted before the passage of this act shall be in any way affected by the provisions thereof."

"SEC. 28. That all laws and parts of laws inconsistent with the provisions of this act be, and the same are hereby, repealed."

Other sections prescribe the modes of procedure in the court established by that act and the punishment for numerous offences.

From this history of the Public Land Strip it appears:

1. That by the act of 1883 all of the " Indian Territory " north of the Canadian River and east of Texas and the 100th meridian, not set apart and occupied by the Cherokee, Creek and Seminole Indian tribes, was attached to the District of Kansas, while the portion not so annexed and not set apart and occupied by the Cherokee, Creek, Choctaw, Chickasaw and Seminole Indian tribes, was annexed to the Northern District of Texas, saving actions or proceedings pending in the Circuit or District Court for the Western District of Arkansas. 2. That, by the act of 1889, the court established for the Indian Territory was given exclusive original jurisdiction over all offences against the laws of the United States committed within the Indian Territory as defined by that act, not punishable by death or by imprisonment at hard labor. 3. That exclusive original jurisdiction was given by the act of 1889 to the courts of the United States, sitting at Paris, Texas, of all such offences, committed within the portion of the Indian Territory annexed to the Eastern District of that State, of which jurisdiction was not given to the court established in and for the Indian Territory.

Much of the discussion by counsel was directed to the inquiry whether the act of 1883 attached the Public Land Strip to the Northern District of Texas. In view of the relations which certain Indian tribes once held to that strip, under treaties with the United States — which treaties will be referred to in another connection — there are some reasons for holding, in accordance with the contention of the government, that it was so attached to that district. But it is not necessary to decide that point; for, however it might be determined, the question would remain whether the Public Land Strip was not within that portion of the Indian Territory, defined in the act of 1889, which was assigned, by that act, for certain judicial purposes, to the Eastern District of Texas. If it was, the court below had jurisdiction of the offence charged in the indictment, unless the latter act is construed as having no application to offences committed prior to its passage. The act of 1883 is chiefly important in the present inquiry as it may serve to explain the provisions of the act of 1889.

It is certain that after, as well as before, the passage of the act of 1883, various public officers and committees in Congress described the "Indian Territory" as lying east of the 100th meridian, and represented the Public Land Strip as being unattached to any judicial district.[1] The most significant, perhaps, of all the official documents of this class are the letter of the Attorney General of the United States to the President under date of November 15, 1887, and that of the Secretary of the Treasury to the Speaker of the House of Representatives, under date of May 1, 1888. The former describes the Public Land Strip as "bounded on the north by the States of Kansas and Colorado, on the east by the Indian Territory, on the south by Texas, and on the west by New Mexico," and says that it was not then "embraced in any district established by law of the United States." The latter, speaking of the urgent need of legislation to enforce the revenue laws of the United States in the Public Land Strip, says that "the land referred to is not embraced in any judicial district, and not being within the jurisdiction of any United States court the laws of the United States are inoperative, or, at least, cannot be enforced therein."

The public documents to which reference has been made undoubtedly show that, in the opinion of many gentlemen in the legislative and executive branches of the government, the "Indian Territory" did not extend further west than the one hundredth meridian, and that, even after the passage of the act of 1883 it remained unattached to any judicial district. So that, if Congress intended by the act of 1883 to annex the Public Land Strip to the Northern District of Texas, it was informed by these documents that that act was not so con-

---

[1] Report of Commissioner of Indian Affairs, 1872, p. 33; Letter of Commissioner of General Land Office to Durant, September 17, 1873, Rec. Com. Gen. Land Office, vol. 27, p. 304; Report of Land Commission, p. 462; Report Com. Land Office, 1884; House Judiciary Committee, Rep. No. 2030, July 2, 1864; *id.* Report, Doc. No. 389, February 11, 1886, embodying letter of Com'r Land Office of January 29, 1886; House Com. on Territories, 1887, Report No. 1684; *id.* 1888, Rep. No. 2857; *id.* February 7, 1888, Rep. 263.

strued by certain officers of the government. But it was further informed that the public interests absolutely demanded that that portion of the public domain should no longer remain in the condition in which it had been left for many years, namely, without being clearly included in some judicial district, whereby the rights of the general government, as well as of individuals, could be enforced against criminals and wrongdoers of every class. No possible reason can be suggested why, at the time of the passage of the act of 1889, the Public Land Strip should not have been brought within some judicial district.

Upon a careful scrutiny of the act of 1889, giving full effect to all of its clauses, according to the reasonable meaning of the words used, yet interpreting it in the light of the previous history of the Public Land Strip, and of the information communicated to Congress by public officers, we do not doubt that Congress intended to bring that strip within the jurisdiction of the court established for the Indian Territory, and to attach it, for limited judicial purposes, to the Eastern District of Texas; thus enabling the general government to protect its own interests, as well as the rights of individuals. That act was so interpreted by Mr. Justice Brewer before his accession to this Bench. *In re Jackson*, 40 Fed. Rep. 372. Observe, that the country over which the court established by that act was to exercise jurisdiction was not described as being east of the 100th meridian and south of Kansas, nor simply as the Indian Territory, but, *ex industria*, as the Indian Territory bounded "north by the State of Kansas, [the southern line of that State constituting about two-thirds of the northern boundary of the Public Land Strip,] east by the States of Missouri and Arkansas, south by the State of Texas, and west by the State of Texas *and* the *Territory of New Mexico.*" If the act had bounded it on the north by Kansas *and Colorado*, the description, beyond all question, would have included the Public Land Strip. But the description, as it is, necessarily includes that strip, because the "Indian Territory," for which the new court, to sit at Muscogee, was established, being bounded on the north by Kansas, *and* west, in part, by "the Territory of

New Mexico"—the eastern boundary of which is on the 103d meridian—must include within its limits the Public Land Strip, lying between New Mexico and the 100th meridian. This fact is of greater significance than the careless omission to state, in the act, that the Indian Territory, described in it, was bounded on the north by Colorado as well as by Kansas. The court at Muscogee was given exclusive original jurisdiction over all offences against the United States, not punishable by death or by imprisonment at hard labor, committed, not simply within the Indian Territory, but within the Indian Territory, " as in this [that] act defined," while the court at Paris was given exclusive original jurisdiction of all offences against the laws of the United States within the limits of that portion of the Indian Territory attached to the Eastern District of Texas " by the provisions of this [that] act," of which jurisdiction was not given to the court at Muscogee. If Congress did not intend to bring the Public Land Strip within the jurisdiction of the court established for the Indian Territory, and, for certain judicial purposes, within the jurisdiction of the courts held at Paris, in the Eastern District of Texas, why did it declare that the Indian Territory, for which it legislated in the act of 1889, was bounded on the west " by the State of Texas *and* the Territory of New Mexico?" We cannot hold the words, " and the Territory of New Mexico," to be meaningless, simply because the northern boundary of that strip was not described with precision and fulness; especially as every consideration of policy demanded that that part of the public domain should not longer be left without courts for the protection of the government and the people.

It is contended that this interpretation of the words " Indian Territory" in the act of 1889 is wholly unauthorized by anything in the history of the Public Land Strip ; for, it is said, that there are no facts whatever that make those words at all appropriate as embracing that strip. This broad statement is scarcely justified by the facts. By the treaty of July 27, 1853, made and concluded at Fort Atkinson, in the Indian Territory, 10 Stat. 1013, between the United States and the

Camanche, Kiowa and Apache tribes or nations, "inhabiting the said territory south of the Arkansas River," it was provided that the annuities stipulated to be given by the United States should be delivered yearly in July to those tribes, collectively, at or in the vicinity of Beaver Creek, a large part of which is within the Public Land Strip. By another treaty with those tribes, October 18, 1865, 14 Stat. 717–721, the United States agreed that a certain district of country, or such parts as the President should from time to time designate, should be and was set apart for their "absolute and undisturbed use and occupation," and that of "such other friendly tribes" as had theretofore "resided within said limits, or as they may from time to time agree to admit among them, and that no white person, except officers, agents and employés of the government, shall go upon or settle within the country embraced within said limits, unless formally admitted and incorporated into some one of the tribes lawfully residing there, according to its laws and usages." The boundaries of said district were: "Commencing at the northeast corner of New Mexico; thence south to the southeast corner of the same; thence northeastwardly to a point on main Red River, opposite the mouth of the north fork of said river; thence down said river to the 98th degree of west longitude; thence due north on said meridian to the Cimarone River; thence up said river to a point where the same crosses the southern boundary of the State of Kansas; thence along said southern boundary of Kansas to the southwest corner of said State; thence west to the place of beginning." These boundaries, it is true, included a part of the State of Texas, and the treaty was, in that respect, ineffectual. Nevertheless, the cession included the Public Land Strip, then a part of the public domain of the United States. By a subsequent treaty with two of the same tribes, concluded October 21, 1867, 15 Stat. 581, 584, they were restricted in territory to the southwest corner of the Indian Territory, but they reserved the right "to hunt on any lands south of the Arkansas River, so long as the buffalo may range thereon in such numbers as to justify the chase." These treaties are referred to as showing that as late as 1867 the Public Land Strip, in the mode of its

use, had some connection with Indians west of the Mississippi, and especially with some of those now occupying permanent reservations in the Indian Territory. That strip, we are informed, has not been occupied by Indians since 1867, but it was not opened to settlement, and could have been used for any of the purposes that the government had in view for Indians.

There are other circumstances that are not without significance as indicating why Congress in the act of 1889 used the words "Indian Territory," as describing not only lands east of the 100th meridian, south of Kansas, but lands north of Texas and between that meridian and New Mexico. Among them the following may be named: 1. To a report of the commissioner of the general land office, made in 1864, was annexed a map, "constructed from the Public Surveys and other official sources in the general land office," in which the Public Land Strip is included within the boundaries of the Indian Territory; and a similar map, "constructed from the plats and official sources of the general land office," under the direction of Commissioner Wilson, was issued in 1867. 2. By an act of March 2, 1887, Congress granted a right of way through the "Indian Territory" to a railroad company, beginning at a point on the northern line of said Territory at or near the south line of Kansas, crossed by the 101st meridian; thence in a southwesterly direction to El Paso, New Mexico. It could not commence at the point designated and reach El Paso by a southwesterly line without passing through the Public Land Strip. Unless that strip was, for the purposes of that act, regarded as a part of the Indian Territory, then the route to El Paso would not pass through the Indian Territory at all. 3. By the treaty of May 6, 1828, with the Cherokee Indians the United States, besides setting apart for the use of that tribe 7,000,000 acres within the limits of the Indian Territory, guaranteed to that nation "a perpetual outlet west, and free and unmolested use of all the country lying west of the western boundary" of the limits given, "and as far west as the sovereignty of the United States and their right of soil extend." In an official communication from the commissioner of the land

office to the Secretary of the Interior, under date of January 29, 1886, embodied in a report made on the 11th of February, 1886, by the Judiciary Committee of the House of Representatives, upon a proposed bill extending the laws of the United States over certain "unorganized territory south of Kansas," it was said : " It appears that the Cherokees claimed the public Land Strip, now so called, as the outlet above mentioned, and the official maps down to 1869, or later, designated said strip as *part of the Indian Territory.* I have not found in the records of this office any expressed reason why this strip was so designated on the maps, nor why that designation was changed upon the maps published after 1869." The commissioner recommended the passage of the proposed bill, because it would take this "unorganized territory out of its anomalous condition to a certain extent and open the lands to entry."

These circumstances are referred to not as conclusive, nor, as in themselves, persuasive, but only to show that the Public Land Strip was regarded, at different times, by public officers to be part of the Indian Territory, as commonly designated, or as having such connection with the lands east of the 100th meridian, where various tribes of Indians had been located by the United States, as made it natural that it should be placed, together with the lands between that meridian and the States of Missouri and Arkansas, not occupied by the civilized Indian tribes, under the jurisdiction of the court established by the act of 1889, or of some other court of the United States. Congress, it must be presumed, was not unaware of the fact that the words "Indian Territory" had been used by some to exclude, and by others to include, the Public Land Strip, and, to avoid misapprehension as to whether that strip was annexed to some judicial district, and, perhaps, for the purpose of meeting the recommendation of the Secretary of the Treasury in his letter of May 1, 1888, it speaks, in the act of 1889, of the Indian Territory, not generally, but *as therein defined.* That description, we have seen, necessarily included the Public Land Strip, because it was the only part of the public domain in that part of the United States that was bounded on

the north by Kansas, as well as on the west by the Territory of New Mexico, and which immediately adjoined the Indian Territory lying east of the 100th meridian.

Much was said at the bar about the unreasonableness of the supposition that Congress intended to subject the people in the Public Land Strip to the jurisdiction of a court sitting at so great a distance as Paris, Texas, rather than to one at Graham, in the Northern District of Texas, or one at Wichita, in Kansas. Judging by the map, the distance from the Public Land Strip to Paris is not much greater than to Graham. Indeed, the facilities for reaching Paris may be quite as good as those for reaching Graham. While the court of the United States nearest to the Public Land Strip, other than the one at Muscogee, seems to be the District Court of Kansas, this fact cannot control, as against the natural meaning of the words of the act.

Nor do we think that the interpretation of the act of 1889 can or ought to be affected by that of 1890, providing a temporary government for the Territory of Oklahoma, and enlarging the jurisdiction of the United States court in the Indian Territory. Oklahoma, by that act, is made to include " all that portion of the United States *now known as the Indian Territory*, except . . . and except the unoccupied part of the Cherokee outlet, together with that portion of the United States known as the Public Land Strip." The boundary of the country " now known as the Indian Territory " and included in said Territory of Oklahoma is given, and the Public Land Strip is, separately, bounded " east by the 100th meridian, south by Texas, west by New Mexico, and north by Colorado and Kansas." This may be regarded at most as simply a declaration by Congress that the country then " known as the Indian Territory " did not include the Public Land Strip, and, therefore, that each should be separately described by its boundaries. But that does not prove that Congress did not intend, in 1889, to include the Public Land Strip in the " Indian Territory," *as defined by the act of that year.* On the contrary, the Oklahoma act, when it bounds that Strip on the " west by New Mexico," tends to show that substantially similar words used in describing the

Indian Territory mentioned in the act of 1889, had reference to the Public Land Strip.

Looking at this question in every light in which it may be considered, we repeat the expression of our opinion that the Public Land Strip, west of the 100th meridian, bounded on the south by Texas, on the west by New Mexico, and on the north by Colorado and Kansas, was annexed by the act of 1889 to the Eastern District of Texas for such judicial purposes as by that act appertained to the court held at Paris in that District.

Was it competent for the court below to try the defendants for the offence of murder committed prior to the passage of the act of 1889? We do not doubt that Congress intended to confer upon that court jurisdiction to try such cases. By the express words of the act, the courts to be held at Paris, Texas, were given exclusive original jurisdiction of "all offences committed against the laws of the United States" within that part of the Indian Territory attached to the Eastern Judicial District of Texas, of which jurisdiction was not given, by the same act, to the court established for that Territory. The only exception made is in the proviso to the eighteenth section, declaring, among other things, that no prosecution commenced before the passage of the act should be in any way affected by its provisions. This, in connection with the previous part of the same section, defining the jurisdiction of the court below, necessarily imports that where no prosecution had been commenced, it should have authority to try all offences, punishable by death or imprisonment at hard labor, committed, no matter when, within the new territory over which its jurisdiction was extended. No other interpretation can be reasonably given to the act. If the Public Land Strip was placed by the act of 1883 in the Northern District of Texas, or if the defendants, having been apprehended in Kansas, were amenable, prior to the act of 1889, to the District Court in that State, the jurisdiction of the United States court of neither of those districts had attached, by the commencement of a prosecution, before that strip was annexed to the Eastern District of Texas. In so interpreting the act of Congress we do not

infringe the settled rule that courts uniformly refuse to give to statutes a retrospective operation, where rights previously vested are injuriously affected, unless compelled to do so by language so clear and positive as to leave no room to doubt that such was the intention of the legislature. *United States* v. *Heth*, 3 Cranch, 399, 413; *Chew Heong* v. *United States*, 112 U. S. 536, 559. The saving of only pending prosecutions shows that Congress did not except any offence against the United States of which the court below was given jurisdiction.

It is contended that the act, so construed, is in violation of section two, article three, of the Constitution, supplemented by the Sixth Amendment. The former provides that "the trial of all crimes, except in cases of impeachment, shall be by jury ; and such trial shall be held in the State where the said crimes shall have been committed; but when not committed within any State, the trial shall be at such place or places as the Congress may by law have directed." The latter provides: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law." In respect to that clause of the Sixth Amendment declaring that the "district shall have been previously ascertained by law," it need only be said that if those words import immunity from prosecution where the district is not ascertained by law before the commission of the offence, or that the accused can only be tried in the district in which the offence was committed, (such district having been established before the offence was committed,) that amendment has reference only to offences against the United States committed within a State. *United States* v. *Dawson*, 15 How. 467, 487, 488; *Jones* v. *United States*, 137 U. S. 202, 211, 212. The second section of article three had provided, in respect to crimes committed in the States, that the trial by jury should be had within the State where the crime was committed. The Sixth Amendment added the further guaranty, in respect to the place of trial, that the district should have been previously ascertained by law, leaving the trial of offences not committed within any

State, to be controlled by the second section of article three. The requirement in the latter section is that the trial "shall be at such place or places as the Congress may by law have directed." "As crimes," said Mr. Justice Story, commenting upon this section, "may be committed on the high seas and elsewhere, out of the territorial jurisdiction of a State, it was indispensable that in such cases Congress should be enabled to provide the place of trial." 2 Story's Const. § 1781. It was consequently provided in the act of April 30, 1790, 1 Stat. 114, c. 9, § 8, that "the trial of crimes committed on the high seas, or in any place out of the jurisdiction of any particular State, shall be in the district where the offender is apprehended, or into which he may first be brought." And such was the law when the crime with which the defendants are charged was committed. Rev. Stat. §§ 730, 5339. But for the passage of the act of 1889, and if the Public Land Strip was not attached by the act of 1883 to the Northern District of Texas, the defendants could have been indicted and tried in the District of Kansas, where they were apprehended. *Jones* v. *United States*, above cited. So that the contention of the defendants is, in effect, that in respect to crimes committed outside of the States, in some place within the exclusive jurisdiction of the United States, Congress is forbidden by the second section of article three of the Constitution from providing a place of trial different from the one in which the accused might have been tried at the time the offence was committed. We do not so interpret that section. The words, "the trial shall be at such place or places as the Congress may by law have directed," impose no restriction as to the place of trial, except that the trial cannot occur until Congress designates the place, and may occur at any place which shall have been designated by Congress previous to the trial. This was evidently the construction placed upon this section in *United States* v. *Dawson*, above cited, where the court, speaking by Mr. Justice Nelson, said: "A crime, therefore, committed against the laws of the United States, out of the limits of a State, is not local, but may be tried at such place as Congress shall designate by law. This furnishes an answer to the argu-

ment against the jurisdiction of the court, as it respects venue, trial in the county, and jury from the vicinage, as well as in respect to the necessity of particular or fixed districts before the offence." p. 488. So, in *United States* v. *Jackalow*, 1 Black, 484, 486: "Crimes committed against the laws of the United States, out of the limits of a State, are not local, but may be tried at such place as Congress shall designate by law; but are local if committed within the State. They must then be tried in the district in which the offence was committed." If Congress — as it did in the act of 1790, which may be regarded as a contemporaneous construction of the Constitution — may provide for the trial of offences committed outside of the States, in whatever district the accused is apprehended, or into which he may first be brought, it is difficult to perceive why, such crimes not being local, it may not provide a place of trial where none was provided when the offence was committed, or change the place of trial after the commission of the offence.

It is said that the construction we place upon the second section of article three makes it obnoxious to the *ex post facto* clause of the Constitution. In support of this position reference is made to *Kring* v. *Missouri*, 107 U. S. 221, where it was declared that any statute passed after the commission of an offence which, "in relation to that offence or its consequences, alters the situation of a party to his disadvantage," is an *ex post facto* law. This principle has no application to the present case. The act of 1889 does not touch the offence nor change the punishment therefor. It only includes the place of the commission of the alleged offence within a particular judicial district, and subjects the accused to trial in that district rather than in the court of some other judicial district established by the government against whose laws the offence was committed. This does not alter the situation of the defendants in respect to their offence or its consequences. "An *ex post facto* law," this court said in *Gut* v. *The State*, 9 Wall. 35, 38, "does not involve, in *any* of its definitions, a change of the place of trial of an alleged offence after its commission."

Another contention of the defendants is that the indictment is fatally defective, in that it fails to sufficiently show when Cross — the person alleged to have been murdered — died, or that he died within a year and a day from the infliction upon him of the alleged mortal wounds, or from the effect of such wounds, or within the territory in the jurisdiction of the court in which they were tried. As the Attorney General and the Solicitor General submit this question without argument, and without any suggestion in support of the indictment, and as the judgment must, for reasons to be presently stated, be reversed, leaving the government at liberty to find a new indictment, if its officers shall be so advised, we will not extend this opinion by an examination of the authorities cited by the defendants to show the present indictment to be defective.

At the trial below, one of the defendants' counsel, who had been attorney general of Kansas, and who, in that capacity, made to the governor of that State a report touching the death of Cross immediately after it occurred, was called, in rebuttal, as a witness for the prosecution. That report contained various statements purporting to have been made by the defendants, and which connected them with the killing of Cross. Although the witness stated that the report was based upon hearsay evidence merely, was thrown together hastily by a stenographer, and was incorrect, and that the defendants had not ma ie the statements therein attributed to them, certain parts of it were admitted in evidence to the jury, against the objection of the defendants. The record shows that this report was read in evidence to show that the witness had made different statements at another time and place. And the court, in its charge, said to the jury: "The instructions given above are limited, so far as the evidence is concerned, by the following instructions: The portions of Attorney General Bradford's report were admitted in evidence to be considered by you as to whether or not the statements therein contained were made by the parties to said Bradford, said Bradford now being attorney for the defendants, and denying the truth of the statements therein contained; and as to whether or not

these statements were ever made to said Bradford, is a question of fact to be considered by you from all the evidence upon that subject; and if you believe the statements were not so made to said Bradford, you are to disregard the same. But if you believe from the evidence that they were so made to said Bradford, then you are instructed to consider them as evidence, but only as to such parties by whom they were made."

The jury were thus informed that this report, although merely hearsay, was substantive evidence upon the issue as to whether the defendants were present at, and participated in, the killing. The representatives of the government, in this court, frankly concede, as it was their duty to do, that this action of the court below was so erroneous as to entitle the defendants to a reversal. Numerous other errors are said to have been committed at the trial to the prejudice of the defendants, but as such alleged errors may not be committed at the next trial, it is not necessary now to consider them.

*For the error above mentioned the judgment is reversed, and the cause remanded with directions to grant a new trial.*