**UNITED STATES**

v.

**Timothy I. MARSH, 046 58 4930, Seaman Apprentice (E-2), U. S. Navy.**

**NMCM 80 1281.**

U. S. Navy-Marine Corps Court of Military Review.

Sentence Adjudged 19 Nov. 1979.

Decided 26 May 1981.

---

LCDR Kerry T. Davidson, JAGC, USN, Appellate Defense Counsel.

CAPT Craig L. Kemmerer, USMCR, Appellate Government Counsel.

LT William C. Martucci, JAGC, USNR, Appellate Government Counsel.

DONOVAN, Judge:

This case presents the issue of retrospective application of the amendments to Article 2, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 802, as violative of the constitutional prohibition against *ex post facto* laws.[2] We examine that issue and conclude that application of the amended Article to an accused who committed an offense before the effective date of the Congressional amendments is prohibited.[3]

---

**2.** U.S.Const. art. I, § 9, cl. 3.

**3.** Panels of the United States Army Court of Military Review have already addressed this issue, *United States v. McDonagh*, 10 M.J. 698 (A.C.M.R.1981); *United States v. Quintal*, 10 M.J. 532 (A.C.M.R.1980). *See also United States v. Boone*, 10 M.J. 715 (A.C.M.R.1981) (offense committed after the effective date). We enjoy the guidance of the United States Supreme Court's most recent treatment of *ex*

Pursuant to his plea, appellant was found guilty of a single offense: unauthorized absence for some 2 and ½ months. Prior to imposing sentence, the military judge considered in aggravation evidence of a special court-martial conviction (three periods of unauthorized absence) and one nonjudicial punishment (NJP) (attempted larceny and possessing marijuana). The sentence of confinement at hard labor for 3 months, forfeiture of $150.00 per month for 3 months, reduction to pay grade E–1, and bad-conduct discharge was approved by the convening authority who noted one other prior NJP. The terms of the pretrial agreement were not triggered. The supervisory authority noted that evidence of the prior conviction was inadmissible; he thereupon reassessed the sentence, remitting one month's forfeiture, but otherwise approved the findings and sentence.

■ Appellant was convicted 19 November 1979, 10 days after the effective date of Congressional amendments to Article 2, UCMJ.[4] The defense made a motion on 19 November to dismiss the charge and specification on the grounds that *in personam* jurisdiction was lacking due to recruiter misconduct. Appellant offered exhibits in support of his motion. Citing *In re Grimley*, 137 U.S. 147, 11 S.Ct. 54, 34 L.Ed. 636 (1890), and the Article 2, UCMJ, amendments, the judge refused to litigate the motion. The issue of jurisdiction was not waived by the guilty plea. Paragraph 67*a*, *Manual for Courts-Martial, 1969 (Rev.)* (MCM).

Trial defense counsel had submitted a brief *in support of the motion challenging* jurisdiction on 2 November, prior to the effective date of the amendments. Appellant asserts in the brief that three recruiting problems existed prior to his enlistment, two of which were known by appellant and all by the recruiter: conviction of larceny in a civilian court, failing the ninth grade, and

not meeting the recruiting service's own minimum "odds-for-effectiveness" (OFE) score. The defense maintained that the recruiter advised appellant to conceal the first two matters; admits that the conviction was waivable; argued that no valid waiver was obtained; that, due to his age, the OFE score was a nonwaivable defect; and that he was therefore ineligible to enlist. The military judge stated that he would consider the motion as having been raised prior to 9 November, even though he decided the issue after that date. Submission of the motion was apparently the reason the defense requested delay at an Article 39(a), UCMJ, 10 U.S.C. § 839(b), session held 3 October. Trial counsel did not agree with the defense version of the facts surrounding the enlistment, although he generally agreed with the defense view of current case law. The judge denied the motion, ruling that the issue was foreclosed by the Article 2 amendments.

Section 2–II–10.a of COMNAVCRUIT-COM INST 1130.8A reflects that "OFE Scores of 68 and below for male, 17 year old non-high school graduates will not be waived." Appellate Exhibit 3. Appellant, who was a 17 year old non-high school graduate at the time he enlisted, allegedly scored an OFE of only 66; the OFE is an index, based on various background facts, used as an indicator of successful service. Section 2–II–3.c of that Instruction notes that the larceny conviction might have been waived by the area commander for Navy recruiting. Appellant presented four appellate exhibits in support of the motion: as indicated before, a brief; excerpts from recruiting regulations; a misdemeanor conviction record; and his high school transcript of grades. None of these documents was weighed since the judge refused to litigate the motion on the authority of Article 2, UCMJ, as amended.[5]

Appellant has assigned one error:

---

*post facto* laws, *Weaver v. Graham,* 450 U.S. 24, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981).

**4.** 10 U.S.C. § 802 (1970), *as amended by* Department of Defense Authorization Act of 1980,

Pub.L.No.96–107, § 801(a), (b) and (c), 93 Stat. 810.

**5.** Article 2(b) and (c), UCMJ, as amended states:

## THE MILITARY JUDGE ERRONEOUSLY REFUSED TO LITIGATE THE MOTION TO DISMISS

 The Government notes appellant has never averred he enlisted involuntarily, under the statutory age, or without capacity to understand the significance of his enlistment. In his brief, appellant yields that his current status is a "member of the armed forces and that he is presently subject to the Uniform Code of Military Justice; and that for administrative purposes his status ... was retroactively established by the amendments to the Uniform Code...." He raises the *ex post facto* prohibition, however, as a bar to penalizing him for his pre-amendment conduct. He further acknowledges that the amendments merely restore the state of the law expressed by *Grimley* but argues that this does not alter his contention that the legal relations and status of service members between 1 August 1975, the date *United States v. Russo*, 1 M.J. 134 (C.M.A.1975), was decided, and 9 November 1979, the date of the amendments, is governed for purposes of the *ex post facto* clause by *Russo*, not *Grimley*. We agree.[6]

## DID CONGRESS INTEND RETROSPECTIVE APPLICATION OF THE ARTICLE 2 AMENDMENTS?

 "The starting point in every case involving construction of a statute is the language itself." *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975) (Powell, J. concurring). The language of Article 2, UCMJ, as amended, is neither clearly prospective only nor clearly retrospective. Facing such ambiguity, we will consider the legislative history of the amendments as it reflects Congressional intent, recognizing that legislative history as a guide to legislative intent is not wholly reliable. *See Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 26, 97 S.Ct. 926, 941, 51 L.Ed.2d 124 (1977). Excerpts from the Senate report follow:

> Subsection (a) of Section 801, therefore, amends Article 2 of the UCMJ to affirm the law and public policy of the United States dealing with the commencement of *in personam* jurisdiction for purposes of the Code.
>
> . . . .
>
> The first portion of the amendment ... overrules that portion of *United States v. Russo* which invalidated for jurisdictional purposes an otherwise valid enlistment because of recruiter misconduct in the enlistment process. It does so by reaffirming the law as set forth by the Supreme Court in *In re Grimley*, 137 U.S. 147 [11 S.Ct. 54, 34 L.Ed. 636] (1890), and requiring compliance with only two factors before an enlistment will be considered valid: capacity to understand the significance of enlistment in the armed forces and the voluntary taking of the oath of enlistment. By recommending

---

(b) The voluntary enlistment of any person who has the capacity to understand the significance of enlisting in the armed forces shall be valid for purposes of jurisdiction under subsection (a) of this section and a change of status from civilian to member of the armed forces shall be effective upon the taking of the oath of enlistment.

(c) Notwithstanding any other provision of law, a person serving with an armed force who—

(1) submitted voluntarily to military authority;

(2) met the mental competency and minimum age qualifications of sections 504 and 505 of this title at the time of voluntary submission to military authority;

(3) received military pay or allowances; and

(4) performed military duties;

is subject to this chapter until such person's active service has been terminated in accordance with law or regulations promulgated by the Secretary concerned.

6. We address the Constitutional issue and attempt to aid the Court of Military Appeals thereby; military departments' Courts of Military Review are not mere boards of review as service review of Constitutional questions was addressed in *United States v. Culp*, 14 U.S.C.M.A. 199, 33 C.M.R. 411 (1963). Judicial power, apart from the U.S.Const. art. III, is "conferred by Congress upon legislative courts, as well as upon constitutional courts." *Williams v. United States*, 289 U.S. 553, 565, 53 S.Ct. 751, 754, 77 L.Ed. 1372 (1933).

these amendments, the committee does not suggest that recruiter malpractice be tolerated, but reliance should be placed on prosecution under Articles 83 and 84, and on administrative reforms, to solve this problem.

The second portion of the amendment . . . provides for jurisdiction based upon a constructive enlistment. A constructive enlistment arises at the time an individual submits voluntarily to military authority, meets the mental competency and minimum age qualifications . . . , receives military pay or allowances and performs military duties. This doctrine is applicable when there is not an otherwise valid enlistment. An individual who meets the four-part test for constructive enlistment will be amenable to UCMJ jurisdiction even if the initial entry of the individual into the armed forces was invalid for any reason, including recruiter misconduct or other improper Government participation in the enlistment process. This amendment thus overrules those portions of *United States v. Brown* [23 U.S.C.M. 162, 165, 48 C.M.R. 778, 781 (1974)], . . . *United States v. Barrett,* 1 M.J. 74 (C.M.A. 1975)], . . . *United States v. Harrison* [5 M.J. 476, 481 (C.M.A.1978)], . . . and *United States v. Russo,* which held that improper Government participation in the enlistment process estops the Government from asserting constructive enlistment. It also overrules that portion of *United States v. Valadez* [5 M.J. 470, 473 (C.M.A. 1978)] . . . which stated that an uncured regulatory enlistment disqualification, not amounting to a lack of capacity or voluntariness, prevented application of the doctrine of constructive enlistment. . . . An individual comes within new Subsection (c) whenever he meets the requisite four-part test regardless of other regulatory or statutory disqualification.

S.Rep.No.197, 96th Cong., 1st Sess. 121–23 (1979), U.S.Code Cong. & Admin.News, 1979, p. 1818.

The counsel to the Military Personnel Subcommittee of the Committee on Armed Services of the House of Representatives raised doubts about retroactivity problems:

Mr. HOGAN. Now, I am troubled a little bit, which I expressed earlier to some of the staff members, about the effective date, the effectiveness of this article 2 legislation. Do we have any retroactivity? Who is in and who is out?

Ms. SIEMER. Counsel, it is our view that the amendments apply to all individuals who are on active duty on the date of the enactment or in the future. They apply to all offenses whenever they are committed consistent with the double jeopardy provisions of the Uniform Code.

We find no effective date problem and no need for a separate effective date provision. The amendments will become effective when they are enacted. Because neither one of these amendments expands the current statutory authority, we find no problem of possibly reaching back to past offenses.

*Amendments to Articles 2 and 36, Uniform Code of Military Justice: Hearings on S. 428 Before the Military Personnel Subcomm. of the House Comm. on Armed Services,* 96th Cong., 1st Sess. 13–14 (1979) (hereinafter cited as *Hearings*).

Later in the hearings, the Judge Advocate General of the Army affirmed the Department of Defense General Counsel's comment about retroactive effect:

Mr. HOGAN. Thank you, Mr. Chairman. One point I want to go over just briefly, and that is the question of the effective date, the effectiveness of the article 2 amendment, retroactivity. Would one of you comment on that?

General PERSONS. Well, it is the position of the Defense Department that it becomes effective on the date it is enacted by reason of the language in the basic bill, that it will apply to all persons in the Armed Forces on the effective date of enactment and, therefore, will apply to offenses that were committed by any of those people even though they happen to have been before the effective date of enactment.

That is the Defense Department's position on the bill, and it is because of the

fact that it is not really changing the law, it is simply making clear what the law is and always has been on jurisdiction over people who enter the Armed Forces.

*Id.* at 52.

MAY THE AMENDMENT BE APPLIED RETROSPECTIVELY TO OFFENSES COMMITTED BEFORE THE EFFECTIVE DATE OF THE AMENDMENT?

"No Bill of Attainder or ex post facto law shall be passed." U.S.Const. art. I, § 9, cl. 3. This prohibition was again expressed in clause 1 of § 10 as to acts of the state legislatures. As was explained by the Supreme Court very early in this nation's history, state or federal legislative action which:

1st. ... makes an action done before the passing of the law; and which was innocent when done, criminal; and punishes such action. 2d. Every law that aggravates a crime, or makes it greater than it was, when committed. 3d. Every law that changes the punishment and inflicts a greater punishment, than the law annexed to the crime, when committed. 4th. Every law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offense, in order to convict the offender

violates the constitutional prohibition. *Calder v. Bull,* 3 U.S. (3 Dall.) 386, 390, 1 L.Ed. 648 (1798).

In another case over 100 years old the Supreme Court defined an *ex post facto* law as "one which imposes a punishment for an act which is not punishable at the time it was committed; or imposes additional punishment to that then prescribed; or changes the rules of evidence by which less or different testimony is sufficient to convict than was then required." *Cummings v. Missouri,* 71 U.S. (4 Wall.) 277, 325–26, 18 L.Ed. 356 (1867). Further commenting on criteria of *ex post facto* laws several years later, a narrow majority of the highest court observed that Calder's four-part test may not have been all-inclusive. It cited Mr. Justice Washington in *United States v.*

*Hall,* 26 F.Cas. 84 (C.C.Pa.1809) (No. 15,285), as adding a clause to the definition of such laws: "*or, in short, which, in relation to the offense or its consequences, alters the situation of a party to his disadvantage.*" *Kring v. Missouri,* 107 U.S. 221, 228, 2 S.Ct. 443, 449, 27 L.Ed. 506 (1883). The Supreme Court further observed:

If the enforcing law ... *takes away or impairs the defense* which the law had provided the defendant at the time ... it is *ex post facto* and inoperative.

. . . .

Can the law with regard to bail, to indictments, to grand juries, to the trial jury, all be changed by state legislation after the offense ... to the disadvantage of the prisoner and not be held to be *ex post facto* because it relates to procedure ...?

And can any substantial rights which the law gave the defendant at the time to which his guilt relates, be taken away from him by *ex post facto* legislation, because, in the use of a modern phrase, it is called a law of procedure? We think it cannot.

. . . .

We are of opinion that any law passed after the commission of an offense which, in the language of Washington, in *U. S. v. Hall,* 'In relation to that offense, or its consequences, alters the situation of a party to his disadvantage' is an *ex post facto* law . . . .

*Id.* at 229, 232, and 235, 2 S.Ct. at 449, 452 and 454.

Not all changes which are retroactively applied violate the prohibition, but only those creating the adverse effects addressed in *Calder v. Bull* and similar authorities. Thus, the Supreme Court, in *Kring v. Missouri,* struck down as an *ex post facto* violation the application of a post-offense, post-trial legislative act which deprived Kring of the benefit of case law favorable to his interests and which as applied would have resulted in the loss of the benefit of prior decisional law (conviction of second-degree murder operating as an acquittal of

first-degree murder). Inasmuch as we believe that the Article 2 amendments erase the benefit of pre-existing case law favorable to a class of offenders, we are compelled to inquire whether *Kring* and other relevant Supreme Court decisions prohibit application of the statute as amended to offenses committed before 9 November 1979.[7]

Just what was affected by the amendments to Article 2, UCMJ? As a helpful commentary on the United States Constitution observed, "in the early case of *Calder v. Bull*, the Supreme Court decided that the [*ex post facto*] phrase, as used in the Constitution, applies only to penal and criminal statutes. But although it is inapplicable to retroactive legislation of any other kind, the constitutional prohibition may not be evaded by giving a civil form to a measure which is essentially criminal." [8]

In *Murphy v. Ramsey*, 114 U.S. 15, 5 S.Ct. 747, 29 L.Ed. 47 (1885), the Supreme Court decided that a statute "merely defined" polygamy as a voter disqualification without violating the *ex post facto* prohibition. In *Cook v. United States*, 138 U.S. 157, 183, 11 S.Ct. 268, 275, 34 L.Ed. 906 (1891), the highest court observed that a venue statute which had been enacted after the date of the offense involved and which was claimed as adverse to the defendant's interests was also not violative of the *ex post facto* prohibition. *Accord, Gut v. Minnesota*, 76 U.S. (9 Wall.) 35, 19 L.Ed. 573 (1870).

A survey of additional cases decided by the Supreme Court concerning issues attacked on *ex post facto* grounds but in which the actions were found nonviolative proves helpful at this juncture:

(a) Deportation based on legislation enacted after the date of the aliens' actions on which the complaints were based. *Marcello v. Bonds*, 349 U.S. 302, 75 S.Ct. 757, 99 L.Ed. 1107 (1955); *Harisiades v. Shaughnessy*, 342 U.S. 580, 72 S.Ct. 512, 96 L.Ed. 586 (1952).

(b) A change in the law prescribing the manner of execution of a death sentence is not an *ex post facto* violation when applied to persons sentenced to death after enactment of the change for murders committed before the date of enactment. *Malloy v. South Carolina*, 237 U.S. 180, 35 S.Ct. 507, 59 L.Ed. 905 (1915). *But see Holden v. Minnesota*, 137 U.S. 483, 11 S.Ct. 143, 34 L.Ed. 734 (1890).

(c) The enlargement of the class of persons ruled competent to testify against a defendant was permitted in *Hopt v. Utah*, 110 U.S. 574, 4 S.Ct. 202, 28 L.Ed. 262 (1884):

> Statutes which simply enlarge the class of persons who may be competent to testify in criminal cases are not *ex post facto* in their application to prosecutions for crimes committed prior to their passage; for they do not attach criminality to any act previously done and which was innocent when done; nor aggravate any crime theretofore committed; nor provide a greater punishment therefor than was prescribed at the time of its commission; nor do they alter the degree, or lessen the amount or measure, of the proof which was made necessary to conviction when the crime was committed.
>
> . . . .
>
> But alterations which do not increase the punishment nor change the ingredients of the offense or the ultimate facts necessary to establish guilt, but, leaving untouched the nature of the crime and the amount or degree of proof essential to conviction, *only removes existing restrictions* upon the competency of certain classes of persons as witnesses, *relate to modes of procedure only*, in which no one can be said to have a vested right, and *which the State, upon grounds of public policy, may regulate at pleasure.* Such regulations of the mode in which the

---

7. We note one witness was willing to yield a few days on the effective date to include the "next pay day" after 9 November. *Hearings* at 27.

8. Legislative Reference Service, Library of Congress, The Constitution of the United States of America 365 (N. Small ed. 1964). *Accord, Burgess v. Salmon*, 97 U.S. 381, 24 L.Ed. 1104 (1878).

facts constituting guilt may be placed before the jury, can be made applicable to prosecutions or trials thereafter had, without reference to the date of the commission of the offense charged.

*Id.* at 589, 590, 4 S.Ct. at 209, 210 (emphasis supplied).

(d) A change giving the trial court the authority to decide whether separate trials of joint offenders would be held (a question which had been solely at the defendant's option at the time of the offense) was upheld. *Beazell v. Ohio,* 269 U.S. 167, 46 S.Ct. 68, 70 L.Ed. 216 (1925).

(e) Changes in the roles of judge and jury at sentencing were retroactively applied on the reasoning that the change did not add to the quantum of punishment. A state court death sentence, vacated on authority of the post-offense Supreme Court decision in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), was reinstated upon authority of a legislative action designed to cure *Furman*-like defects. The Supreme Court upheld the resentencing against *ex post facto* attack, observing that it was a procedural change fairly applied because the accused had pre-offense notice that the death penalty existed for his offense. *Dobbert v. Florida,* 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977).

(f) The statute of limitations, not expired for an offense, may be extended prior to expiration and an offender punished during the extended period for an offense which initially carried the shorter period. *Clements v. United States,* 266 F.2d 397 (9th Cir. 1959); *United States v. Ganaposki,* 72 F.Supp. 982 (N.D.Pa.1947); *United States v. Fraidin,* 63 F.Supp. 271 (D.Md.1945).

(g) The *ex post facto* threat of a Congressional act changing the jurisdiction over crimes in "No Man's Land" from the court of one district of Texas to another district of Texas was examined in *Cook v. United States,* 138 U.S. 157, 11 S.Ct. 268, 34 L.Ed. 906 (1891). In reviewing the exercise of such changed jurisdiction over a murder committed prior to the act, the court concluded that there was clear Congressional

intent for retrospective application. Finding such, Mr. Justice Harlan (Senior) writing for the Court went on to test such application against the *ex post facto* prohibition and found no violation, reasoning that the change affected only the physical place of trial, not the nature of the offense or its consequences. Citing *Cook* five years later, the Supreme Court found the terms of a Congressional act realigning judicial divisions within a judicial district to be similarly permissible in enforcement. *Post v. United States,* 161 U.S. 583, 16 S.Ct. 611, 40 L.Ed. 816 (1896).

Looking beyond the wording of the changes to evaluate the impact they wrought on those affected, other changes have been found violative of the prohibition:

(a) A divided Supreme Court rejected the argument that a civil penalty, which deprived a lawyer of livelihood by disbarring him from federal courts for his Civil War allegiance, was not violative of the *ex post facto* prohibition on legislative acts. It rejected the reasoning that disbarment was merely civil action, not a criminal penalty. *Ex Parte Garland,* 71 U.S. (4 Wall.) 333, 18 L.Ed. 366 (1867).

(b) A legislative reduction of the number of persons to sit as a criminal jury from 12 persons to 8, enacted after the offense, was found violative. *Thompson v. Utah,* 170 U.S. 343, 18 S.Ct. 620, 42 L.Ed. 1061 (1898).

(c) Shifting the burden of proof on insanity defenses to the accused may not be retrospectively applied. *United States v. Williams,* 475 F.2d 355 (D.C.Cir.1973).

(d) Post-Civil War retributive conduct against a broad class of persons was struck down as applied to a clergyman in *Cummings v. Missouri,* 71 U.S. (4 Wall.) 277, 18 L.Ed. 356 (1867). Cummings was penalized for his refusal to take a loyalty oath denying any Southern sympathies. Speaking of *ex post facto* laws and bills of attainder, the bare majority of the Supreme Court observed that "[t]he Constitution deals with substance, not shadows. Its inhibition was leveled at the thing, not the name. It

intended that the rights of the citizen should be secure against deprivation for past conduct by legislative enactment, under any form, however disguised." *Id.* at 325.

(e) The retrospective application of legislation designed to control union officials' use of union funds was faulted as *ex post facto* when applied to conversions of funds committed before the enactment. *Woxberg v. United States,* 329 F.2d 284 (9th Cir. 1964).

(f) A post-enactment prosecution by information, rather than by indictment as earlier required, was found to be a substantial right and not merely procedural. *Putty v. United States,* 220 F.2d 473 (9th Cir. 1955).

Government counsel rely on *Post v. United States, supra,* for authority to exclude the very subject of jurisdiction from the class of matter subject to *ex post facto* attack. The basic reason behind the *ex post facto* prohibition is the unfairness of penalizing a person who has no prior notice of prohibited conduct, or no notice of a heavier-than-previous penalty for or easier-than-previous proof of prohibited conduct. The Government correctly argues that appellant had notice of his amenability to punishment for his offense, notice of the offense itself, and notice of its punishment by means of having been instructed in accordance with Article 137, UCMJ, 10 U.S.C. § 937.[9] Since neither the elements of the offense nor the punishment for the offense changed, nor the means or manner of proof, so argues the Government, there was no variance from the *status quo* such as to arm appellant for an *ex post facto* attack.

The Supreme Court has just addressed a similar issue recently as it applied to changes Florida made in the manner of computing the time by which sentenced prisoners obtain reductions from their pris-

on terms. *Weaver v. Graham, supra,* 450 U.S. at 26 n. 3, 101 S.Ct. at 963 n. 3. Mr. Justice Marshall explained that "the Framers [of the Constitution] sought to assure that legislative acts give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed." *Id.* at 28, 101 S.Ct. at 964, citing *Dobbert v. Florida, Kring v. Missouri* and *Calder v. Bull,* all *supra.* The majority opinion in *Weaver* also noted, *id.* at 29, 101 S.Ct. at 964 n. 10, that: "The *ex post facto* prohibition also upholds the separation of powers by confining the legislature to penal decisions with prospective effect and the judiciary and executive to applications of existing penal law", citing *Ogden v. Blackledge,* 6 U.S. (2 Cranch) 272, 277, 2 L.Ed. 276 (1804).[10]

Appellant would undoubtedly emphasize the following language from *Weaver v. Graham* : "it is the effect, not the form, of the law that determines whether it is *ex post facto.*" 450 U.S. at 31, 101 S.Ct. at 965. These words characterized the loss of prospective "gain time" deducted from prison sentences. The words may very well stand, beyond the facts of *Weaver,* for a summary comment on *ex post facto* cases. Even in this broader view however, the Article 2 amendment, standing alone, might survive attack because there is no increase of penalty or loss of prospective gain; rather, Congress restated the law on enlistments and signalled the Court of Military Appeals that the executive branch of Government will individually redress cases of recruiter fraud, grant administrative relief to its victims, and provide punishment for erring recruiters. Therein, the Court of Military Appeals judicially imposed remedy was rejected as *ultra* the statutory scheme of military law and procedure. Service members in appellant's situation were not instructed on the *Russo, Catlow, Brown,*

---

9. "Articles to be explained . . . articles 2, 3, . . . 77–134 . . . shall be carefully explained to each enlisted member at the time of his entrance on active duty, or within six days thereafter. They shall be explained again after he has completed six months of active duty, and again when he reenlists. . . ." Appellant enlisted 30 July 1976 for 4 years; his absence began 29 May 1979.

10. It could be observed that *Russo* was neither a limitation nor application of existing penal law but a judicial fiat.

*Valadez* tangle, nor would they reasonably acquire notice of that case law such as to develop an expectancy of immunity from prosecution. They were, instead, drilled on their duty to obey and reminded of sanctions for disobedience. The Article 2 amendments came, therefore, as no change to them.

WERE THE ARTICLE 2 AMENDMENTS A CHANGE IN LAW, A MERE RESTATEMENT, OR SOMETHING ELSE?

The dates of the House hearings on the proposed amendments were 11 and 12 June 1979. Inasmuch as the inception date of Marsh's unauthorized absence was in May, any publication of the hearings, however rapid, would not thereby give him notice of impending Congressional revocation of the judicially created *Russo* defense then available to him and others similarly situated.

From the vantage of military and civilian relations in American society, and considering their rights and duties, the amendments to Article 2 seem to present no change in existing law. The landmark case of *In re Grimley, supra,* involved a 40-year-old enlistee who said he was 28 and who joined the Army in violation of a statute which set 35 years as the maximum age. The Supreme Court specifically noted the law of contracts, observed that the age limit was for the protection of the Government, and stated that only the party for whose benefit the age limit was applied may take advantage of the other party's disqualification. The Court noted that Grimley's enlistment was apparently free of "duress, imposition, ignorance, or intoxication." *Id.* 137 U.S. at 151, 11 S.Ct. at 54. It further observed, however, that an enlistee's "status" cannot be thrown off at the enlistee's "own volition" although "these considerations may not only apply where there is insanity, idiocy, infancy; or any other disability which, in its nature, disables a party from changing his *status* . . . ." *Id.* at 152–53, 11 S.Ct. at 55 (emphasis added). Public policy was not only considered, but addressed, by the nation's highest court: "So, unless there be in the nature of things some inherent vice

in the existence of the relation, or natural wrong in the manner in which it was established, public policy requires that it should not be disturbed." *Id.* at 153, 11 S.Ct. at 55.

In a case decided the same year as *Grimley,* and citing it, the Supreme Court examined the *habeas corpus* petition of a 21-year-old soldier who sought discharge on the basis of age irregularity at the time of his enlistment. He enlisted at 17 without parental consent and deserted less than one month later. After more than five years in concealment, he went to the Army and demanded discharge on the ground that a statute existing at the time of his enlistment required parental consent for enlistment of those under 21. The Court noted that he was over the statutory minimum age of 16 upon enlistment and that the restriction was for the benefit of the parents. Absent parental complaint, petitioner's status was "not only *de facto,* but *de jure,* a soldier—amenable to military jurisdiction." *Morrissey v. Perry,* 137 U.S. 157, 159, 11 S.Ct. 57, 34 L.Ed. 644 (1890).

The Congressional amendments to Article 2 prompted the presses to print new pages, but on their face they do not appear to be either substantive changes in law nor procedural changes affecting substantive rights. One might conclude otherwise if the armed services since 1890 had relied upon a United States District Court or United States Court of Appeals decision, for then the Court of Military Appeals subsequent case law would clearly have superseded it. The law of *Grimley* and *Morrissey,* however, was the highest law of the land. The Congress relied upon it in fashioning pre- and post-UCMJ military law. The amendments do no more than correct the course for intervening judicial drift. Judge Fletcher essentially acknowledged this in his testimony:

In substance, this amendment effectively would permit court-martial jurisdiction to be exercised over any person who has the capacity to understand the significance of enlistment and who voluntarily takes the oath of enlistment. In addition, where the previous two factors

are not met, court-martial jurisdiction still could be exercised by means of a voluntary constructive enlistment as defined within the amendment.

*Hearings* at 90.

The Senate viewed the amendments as a clarification, not as a change: "Subsection (a) of Section 801, therefore, amends Article 2 of the UCMJ to affirm the law and public policy of the United States dealing with the commencement of *in personam* jurisdiction for purposes of the Code." S.Rep.No.197, 96th Cong., 1st Sess. 121 (1979). The report added that it "does so by reaffirming the law as set forth by the Supreme Court in *In re Grimley* . . . and requiring compliance with only two factors before an enlistment will be considered valid: capacity to understand the significance of enlistment in the armed forces and the voluntary taking of the oath of enlistment." *Id.* at 122, U.S. Code Cong. & Admin.News, 1979, p. 1827.

The concept of jurisdiction encompasses the sovereign's power to act against offenders. In *Russo*, the Court of Military Appeals raised a judicial bar to the trial of those accused who the Court concluded had been enlisted through the misconduct of the services' own recruiters. The Court of Military Appeals noted the paucity, if not absence, of prosecutions against recruiters for apparently recurring violations of Article 84, UCMJ, 10 U.S.C. § 884, and, facing this inaction by the executive in the presence of wrongs, imposed a judicial penalty for governmental irregularity. The authority was "public policy" as the Court perceived Congress intended it. By the amendments to Article 2, the third branch of government, the Congress, clarified judicial doubts by reaffirming the law of enlistments. Recruiter misconduct shall therein continue to be amenable to trial by court-martial, or lesser disciplinary forums, under Article 84, UCMJ.[11]

11. *See United States v. McDonagh*, 10 M.J. 698, 712 (A.C.M.R.1981) (Clause, J. concurring/dissenting). If CMA contemplates overruling *Russo*, the following observations might be of value:

> From early times Anglo-American courts have refused to enforce illegal contracts, that is, those that are "opposed to public policy." As a rule, no substantial distinctions were made by the courts among situations where the contract bore an element of criminality, where the contract might prove to be a step in the commission of the crime (either by way of making its commission possible or by way of enjoying its fruits), and where the contract was merely shocking to the sense of justice and of the fitness of things. In each instance the judges, as representing the community conscience, declared that such contracts should not be executed with the court's assistance, because to assist in their enforcement would be to encourage conduct which was inimical to the public welfare.
>
> . . . .
>
> But when the legislature selected only one sanction to enforce compliance with what it regarded as the public interest, the courts at once came face to face with the problem whether the selection of one negatived the desirability of also utilizing another.
>
> . . . .
>
> The judicial plowing of the soil in this field has led to the growth of patent inanities. Because a contract is part of an illegal transaction is no reason for disregarding its existence or for declining to weigh the conse-

> quences of holding it to be void. Nor should a court's disposition of a contract be dependent solely upon whether it purports to find the presence or absence of a purely imaginary legislative intent that a given result be reached.
>
> To inject a rational basis of decision it is necessary to sweep aside the cliches and pseudo-scientific measures which now customarily accompany examination of the question whether courts should enforce contracts in this category. Some courts have already frankly reverted to the old position. They have refused to lend their aid to contracts which they deemed to be contrary to public policy. They have exercised their inherent power to avoid permitting their process to be used for antisocial ends—exercised this power not because legislatively directed to do so in a particular case, but because, in their own discretion, they deemed such an exercise necessary as a protection of the public welfare against noxious consequences.
>
> . . . .
>
> What does or does not represent the general interest is for the legislature to determine. Equipped to make factual investigations, constituted so that in greater or lesser degree it is responsive to the judgments and desires of that balance of interests known as the general public, the legislature must today be regarded as the court of last resort in resolving the clamorous claims for one policy or another. Less and less, even in the disposition of constitutional questions, do the courts seek to substitute for the legislative judgment

The fundamentals of military jurisdiction were addressed by the Court of Military Appeals in *United States v. Schuering*, 16 U.S.C.M.A. 324, 36 C.M.R. 480 (1966):

> Military jurisdiction has two aspects. First, the accused must be subject to military law at the time of the commission of the offense and at the time of trial. Secondly, the offense must be committed at a time when the accused is amenable to the Uniform Code.

*Id.* at 327, 36 C.M.R. at 483.

In 1958, the Supreme Court addressed the impact on servicemen of § 401(g) of the Nationality Act of 1940 and found it an invalid Congressional penalty in that it stripped United States citizenship from servicemen who were convicted of desertion at courts-martial if the sentence, as approved, included dismissal or dishonorable discharge. The penalty was viewed as violative of the Eighth Amendment prohibition against cruel and unusual punishment. Although the *ex post facto* clause was not determinative of the outcome, the court analyzed the nature of the legislation and expressed the following language which is helpful in our review of the case before us:

> In form Section 401(g) appears to be a regulation of nationality. The statute deals initially with the status of nationality and then specifies the conduct that will result in loss of that status. But surely form cannot provide the answer to this inquiry. A statute providing that "a person shall lose his liberty by committing bank robbery," though in form a regulation of liberty, would nonetheless be penal. Nor would its penal effect be altered by labeling it a regulation of banks or by arguing that there is a rational connection between safeguarding banks and imprisoning bank robbers. The inquiry must be directed to substance.

This Court has been called upon to decide whether or not various statutes were penal ever since 1798. *Calder v. Bull* (U.S.) 3 Dall. 386, 1 L.Ed. 648. Each time a statute has been challenged as being in conflict with the constitutional prohibitions against bills of attainder and ex post facto laws, it has been necessary to determine whether a penal law was involved, because these provisions apply only to statutes imposing penalties. In deciding whether or not a law is penal, this Court has generally based its determination upon *the purpose* of the statute. If the statute imposes a disability for the purposes of punishment—that is, to reprimand the wrongdoer, to deter others, etc., it has been considered penal. *But a statute has been considered nonpenal if it imposes a disability, not to punish, but to accomplish some other legitimate governmental purpose.* The Court has recognized that any statute decreeing some adversity as a consequence of certain conduct may have both a penal and a nonpenal effect. The *controlling nature of such statutes normally depends on the evident purpose of the legislature.*

*Trop v. Dulles*, 356 U.S. 86, 95–96, 78 S.Ct. 590, 595, 2 L.Ed.2d 596 (1958) (emphasis added) (footnotes omitted).

The Government could argue that "the evident purpose," *Trop v. Dulles, supra,* is not to erase the defense of irregular recruitment previously available to an accused, but to stabilize the court-martial jurisdiction question throughout the armed forces so that from 9 November 1979 on there is an assurance of power to act judicially whereas doubt has permeated military judicial proceedings from late 1975 to 9 November 1979.

---

their own convictions concerning what is wisdom.... The former embarrassing confusions of functions is abating.... There is still smaller reason ... for the courts to question the definitiveness of the legislative conclusion that what has been proscribed is in fact something which, if not impeded, would operate to the public detriment. In short, every definition of a crime contains an implicit declaration that the results of the prohibited conduct are "against public policy," and there is no justification for the courts' hesitating ... in accepting that declaration as an appraisal conclusive for the moment, of what is in fact "against public policy."

Gellhorn, CONTRACTS AND PUBLIC POLICY, 35 Columbia L.Rev. 679 (1935) (footnotes omitted).

Those involved in day-to-day trial work in the Department of the Navy are familiar with the chorus of actual and alleged recruiting irregularities: disclosed but concealed civilian convictions, drug abuse, dependents, physical ailments, school failures, among others. The amendments to Article 2 sweep away apprehensions of such matters and restore a *Grimley* simplicity to military life. If Congress intended thereby to free commanders from fear such defects would bar trial, the more to concentrate on training those who took an oath to serve the national defense, such motives can properly be noted in analyzing "the evident purpose" and assessing their weight in the *ex post facto* scale. Although such motives are not clearly expressed and might seem obvious to those close to the ranks, salvation of Article 2 from *ex post facto* attack must fail because of other things which the amendments do which are not expressly stated.

Without stating so, Article 2 as amended nullifies by operation of law, as to issues predicated upon recruiter misconduct, certain portions of the Manual for Courts-Martial.[12]

Paragraph 215 MCM, is entitled "MOTIONS IN BAR OF TRIAL." Subparagraph *a* thereof recites:

> Lack of jurisdiction. Court-martial proceedings without jurisdiction over either the person or the offense charged are a nullity. See 9, 11, and 68*b*.

That this is a matter of defense is made clear by introductory language in paragraph 214, MCM, which in part provides:

> For the purpose of this chapter, matters of defense include: (1) various motions by the defense in bar of trial which, while ordinarily not relating to the guilt or innocence of the accused, may result in a dismissal of the charges; ... Included among these matters are motions to dismiss for lack of jurisdiction....

Paragraph 68*a,* MCM, states in part:

> A motion to dismiss properly relates to any defense or objection raised in bar of trial. Among the defenses and objections which may be raised by this motion before entering a plea are lack of jurisdiction ...
>
> ....
>
> b. Lack of jurisdiction; failure to allege an offense. (1) General. If the court lacks jurisdiction or if the charges fail to allege any offense under the code, the proceedings are a nullity. These objections *cannot* be waived and *may* be asserted at any time.
>
> (2) *Lack of jurisdiction.* A motion to dismiss on the ground of lack of jurisdiction is ordinarily based on an assertion that the court is not properly constituted because it was not convened by an official empowered to convene it or on an assertion that the accused is not a person who properly may be tried by court-martial. See 8 as to requisites for court-martial jurisdiction and 9 as to jurisdiction of courts-martial as to persons.

Appellate Government counsel seeks to reassure us that:

> As before 9 November 1979, the effective date for the amendment, a military accused still can challenge the jurisdiction of a court-martial over his person through a motion in bar of trial (motion to dismiss for lack of jurisdiction) under paragraphs 68(b)(2) and 215(a) of the *Manual for Courts-Martial, 1969 (Rev.).*

Appellate Government Brief at 11. Yet this is the very thing appellant sought and the judge refused. The reassurance is unconvincing; although Congress contemplated that idiocy, minority, or some fundamental defect could be litigated, attempts to pierce the enlistment by searching for *Russo* conditions would render the amendments nugatory. Appellate Government counsel, to be fair, recognized this as a "disadvantage" but deemed it tolerable. We find it intolerable. The Article 2 amendments appear to be a conclusive presumption of law, retrospectively applied.

---

**12.** Judge Fletcher was of the view that the amendment nullifies 10 U.S.C. § 504 (1970). *Hearings* at 90.

After careful examination of authorities,[13] many of which were previously quoted or cited, we conclude that, although not every change retrospectively applied to an accused with an adverse effect will fail the *ex post facto* test, and understanding that labels will not determine the legal conclusion when a labeled change is challenged, this Article 2 change is a real change in the law, not a mere restatement. It is new language with new results. The act vaporizes paragraph 215*a* and that portion of paragraph 68*b* as they apply to motions to dismiss for lack of jurisdiction over the person based on recruiter misconduct, disadvantaging appellant and those in his status.[14] The Congressional act, as applied, violates the *ex post facto* prohibition because it "deprives one charged with crime of [a] defense available according to law at the time when the act was committed. . . ." *Beazell v. Ohio*, 269 U.S. 167, 169–170, 46 S.Ct. 68, 70 L.Ed. 216 (1925).[15]

Accordingly, the findings and sentence are set aside; the case is returned to the Judge Advocate General for return to the supervisory authority for a rehearing if practicable.[16] If a rehearing is impracticable, the Charge should be dismissed and any property of which appellant has been deprived restored. Article 66(d) and (e), UCMJ; 10 U.S.C. § 866(d) and (e); paragraph 100*b*, MCM.

Chief Judge CEDARBURG, Senior Judge GREGORY, and Judges SANDERS, BOHLEN and GLADIS, concur.

BAUM, Senior Judge (dissenting):

I agree with the majority's conclusion that the 1979 amendments to Article 2, UCMJ, apply retroactively, but I must disassociate myself from the remainder of the opinion and, in particular, the determination that retroactive application of the Article 2 amendments to individuals who committed offenses prior to the amendments' effective date is prevented by the Constitutional prohibition against *ex post facto* laws. In this regard, I join with my brothers in the Army who find the Constitutional *ex post facto* provisions inapplicable to the situation posed by these amendments relating to court-martial jurisdiction. *See United States v. McDonagh*, 10 M.J. 698, 711–13 (A.C.M.R.1981) (Foreman and Clause, JJ., concurring in part and dissenting in part).

In further amplification of my position, I see these amendments as merely restating expressly what had always been the law. Be reaffirming the principles of *In re Grimley*, 137 U.S. 147, 11 S.Ct. 54, 34 L.Ed. 636 (1890), the United States Congress created no new rules; it simply underscored the continuity in the law from *Grimley* to the present. By its action, the Congress of the United States rejected the pronouncement of *United States v. Russo*, 1 M.J. 134 (C.M.A.1975), for what it was, an attempt at judicial legislation beyond the authority of the Court of Military Appeals and clearly in conflict with the legislative intent of Congress. The military services suffered the adverse effects of that ill-advised opinion for four years, with literally thousands of military offenders escaping prosecution and conviction. To continue this charade for what may be an unlimited indefinite period, permitting countless past offenders—both

---

**13.** The scholarly memorandum opinion of Commander G. R. Greiveldinger, JAGC, USN, military judge in the case of *United States v. Yeager*, a special court-martial convened at Naval Training Center, Great Lakes, was especially helpful in its insightful approach to the *ex post facto* question in that case in regard to the amendments to Article 2, UCMJ.

**14.** *See generally Weaver v. Graham, supra* 450 U.S. at 28, 101 S.Ct. at 964.

**15.** Language in *United States v. Brinson*, 8 M.J. 733 (N.C.M.R.1980), suggesting a contrary result is thus overruled. Our decision refers to

an offense committed before the effective date of the amendments; no *ex post facto* defect seems facially evident, however, if the amendment is applied to offenses committed after the effective date.

**16.** We decline to decide at this level whether appellant's enlistment was void or merely voidable because we do not have the litigated facts. *Compare United States v. Russo*, 1 M.J. 134 (C.M.A.1975), *with United States v. Valadez*, 5 M.J. 470 (C.M.A.1978), *and United States v. Wagner*, 5 M.J. 461, 468 (C.M.A.1978).

absentees and common law felons—to periodically reappear and assert the renounced doctrine of *Russo* and thereby avoid accountability for criminal acts is, in my view, unthinkable. If the Court of Military Appeals contemplates perpetuating this situation by finding the Article 2 amendments to be *ex post facto* laws, as has been done in the majority opinion, I urge that Court, instead, to avoid this result by expressly overruling *United States v. Russo*, as suggested by Judge Clause in *United States v. McDonagh, supra.*

Judge ABERNATHY and Judge KERCHEVAL join in Senior Judge BAUM's dissent.