# Statutory Mandate to Propose Legislation in Response to Medicare Funding Warning

The Recommendations Clause bars Congress from enacting laws that purport to prevent the President from recommending legislation that he judges "necessary and expedient."

The Recommendations Clause bars Congress from enacting laws that purport to require the President to recommend legislation even if he does not judge it "necessary and expedient."

Section 802 of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, which requires the President to submit "proposed legislation" in response to a Medicare funding warning under section 801(a)(2), contravenes the Recommendations Clause and may be treated as advisory and non-binding.

August 25, 2016

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
OFFICE OF MANAGEMENT AND BUDGET

Section 802 of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, 117 Stat. 2066 ("Medicare Modernization Act"), provides that "[i]f there is a medicare funding warning under section 801(a)(2) of the [Medicare Modernization Act] made in a year, the President shall submit to Congress . . . proposed legislation to respond to such warning." *Id.* § 802(a) (codified at 31 U.S.C. § 1105(h)(1)). We previously advised you that section 802 conflicts with the President's duty under the Recommendations Clause to "recommend to [Congress's] Consideration such Measures as he shall judge necessary and expedient," U.S. Const. art. II, § 3, and that the President may therefore continue to treat this provision as "advisory and not binding," *e.g.*, Office of Management and Budget, *Analytical Perspectives, Budget of the U.S. Government, Fiscal Year 2010* at 197 (2009) ("FY 2010 Budget Submission"). This memorandum opinion memorializes and further explains the basis for our advice.

In Part I, we describe the relevant provisions of the Medicare Modernization Act and summarize the Executive Branch's statements regarding section 802. In Part II, we discuss the scope of the Recommendations Clause. As we explain, while the Clause expressly states only that the President has the authority and duty to recommend to Congress those

measures that he judges necessary and expedient, our Office has long maintained that the Clause—like other provisions of Article II that assign responsibilities to the President—implicitly bars Congress from enacting legislation that would prevent the President from exercising, or that would usurp, that authority and duty. Accordingly, as we explain in Part II.A, we believe the Clause bars Congress from enacting laws that purport to prevent the President from recommending legislation that he judges "necessary and expedient." And as we explain in Part II.B, we believe the Clause also bars Congress from enacting laws that purport to require the President to recommend legislation even if he does *not* judge it "necessary and expedient." In Part III, we apply this interpretation of the Recommendations Clause to section 802, explaining that because it purports to direct the President to "submit to Congress . . . proposed legislation to respond to [a medicare funding] warning" without regard to whether the President considers such legislation "necessary and expedient," it conflicts with the Recommendations Clause.

## I.

The Medicare Modernization Act, enacted in 2003, made a variety of reforms to the Medicare system. Among other provisions, the Act contains several measures designed to contain the costs of Medicare expenditures. *See* Medicare Modernization Act tit. VIII. Section 801 of the Act provides that if Medicare trustees determine in two consecutive annual reports that the portion of total Medicare expenses funded from general revenues, as opposed to dedicated Medicare financing sources, is projected to exceed 45 percent for the fiscal year in which the report is submitted or for any of the succeeding six fiscal years, that determination "shall be treated as a medicare funding warning." *Id.* § 801(a)(2); *see id.* § 801(a)(1)(B), (c)(1)–(4). Section 802(a) added a new subsection (h) to 31 U.S.C. § 1105, the statute governing the President's annual budget submission. That new subsection provides that "[i]f there is a medicare funding warning under section 801(a)(2) of the [Medicare Modernization Act] made in a year, the President shall submit to Congress, within the 15-day period beginning on the date of the budget submission to Congress under [31 U.S.C. § 1105(a)] for the succeeding year, proposed legislation to respond to such warning." 31 U.S.C. § 1105(h)(1); *see also* Medicare Modernization Act § 802(b) (stating that "[i]t is the sense of

Congress" that "legislation submitted pursuant to section 1105(h) of title 31, United States Code, in a year should be designed to eliminate excess general revenue medicare funding . . . for the 7-fiscal-year period that begins in such year"). Sections 803 and 804 provide that, once the President submits a proposal pursuant to section 802, members of each House of Congress "shall introduce such proposal (by request), the title of which [shall be] 'A bill to respond to a medicare funding warning.'" Medicare Modernization Act §§ 803(a)(1), 804(a)(1). "Such bill" must then be referred to the appropriate committees for consideration. *Id.* §§ 803(a)(1)–(2), 804(a)(1)–(2); *see also id.* §§ 803(b)–(d), 804(b)–(e) (setting forth certain expedited procedures for consideration of bills to respond to a medicare funding warning).

Upon signing the Medicare Modernization Act in 2003, President Bush stated that the Executive Branch would construe section 802 "in a manner consistent with the President's constitutional authority . . . to recommend for the consideration of the Congress such measures as the President judges necessary and expedient." *Statement on Signing the Medicare Prescription Drug, Improvement, and Modernization Act of 2003* (Dec. 8, 2003), 2 Pub. Papers of Pres. George W. Bush 1698, 1698 (2003). President Bush later responded to a medicare funding warning by submitting draft legislation to Congress. *See* H.R. 5480, 110th Cong. (2008). In response to a subsequent medicare funding warning, President Obama's first budget submission stated that "[i]n accordance with the Recommendations Clause of the Constitution, the President considers th[e] requirement [in section 802] to be advisory and not binding," but that "[n]evertheless, the President has put forth Budget proposals that would . . . address the warning conditions." FY 2010 Budget Submission at 197–98. President Obama's subsequent budget submissions have included similar language.[1]

---

[1] *See* Office of Management and Budget, *Analytical Perspectives, Budget of the U.S. Government, Fiscal Year 2017* at 29 (2016); Office of Management and Budget, *Analytical Perspectives, Budget of the U.S. Government, Fiscal Year 2016* at 29–30 (2015); Office of Management and Budget, *Analytical Perspectives, Budget of the U.S. Government, Fiscal Year 2015* at 30 (2014); Office of Management and Budget, *Analytical Perspectives, Budget of the U.S. Government, Fiscal Year 2014* at 57 (2013); Office of Management and Budget, *Analytical Perspectives, Budget of the U.S. Government, Fiscal Year 2013* at 65–66 (2012).

## II.

The Recommendations Clause provides that the President "shall from time to time . . . recommend to [Congress's] Consideration such Measures as he shall judge necessary and expedient." U.S. Const. art. II, § 3. Although the express terms of the Clause state only that the President has the duty and the authority to recommend measures he judges necessary and expedient, this Office has long maintained that the Clause implicitly prohibits Congress from enacting legislation that would prevent the President from exercising, or would usurp, that duty and authority. Accordingly, we have maintained for over half a century that Congress may not enact statutes, commonly known as "muzzling laws," that purport to prevent the President from recommending legislation he thinks necessary and expedient. *See, e.g.*, *Constitutionality of a Joint Resolution Requiring the President to Propose a Balanced Budget Every Year*, 1 Op. O.L.C. Supp. 161, 161 (Aug. 16, 1955) ("*Constitutionality of Joint Resolution*") ("It appears too clear for serious question that a legislative fiat which seeks to remove the President's unlimited judgment in communicating with the Congress is in violation of the [Recommendations Clause].");  *Lobbying by Executive Branch Personnel*, 1 Op. O.L.C. Supp. 240, 246 (Oct. 10, 1961) ("[A] literal interpretation of 18 U.S.C. § 1913 which would prevent the President or his subordinates from formally or informally presenting his or his administration's views to the Congress . . . as to the need for new legislation or the wisdom of existing legislation . . . would raise serious doubts as to the constitutionality of the statute.");  *Authority of the United States to Enter Settlements Limiting the Future Exercise of Executive Branch Discretion*, 23 Op. O.L.C. 126, 147 (1999) ("*Authority to Enter Settlements*") (stating that "Congress . . . is powerless to restrict the President's discretionary exercise of" his "power to make recommendations to Congress"). And for more than thirty years, we have also taken the position that Congress may not enact statutes that purport to require the President to recommend legislation even if he does not consider it necessary and expedient. *See, e.g.*, Memorandum for Michael J. Horowitz, Counsel to the Director and General Counsel, Office of Management and Budget, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, *Re: Chicago School Case* at 18 (Aug. 9, 1984) ("*Chicago School Case*") (concluding that "Art. II, § 3 insulates the President from any compulsion to submit legislative pro-

posals that he does not judge to be necessary or expedient"); *Constitutional Issues Raised by Commerce, Justice, and State Appropriations Bill*, 25 Op. O.L.C. 279, 283 (2001) ("Under the Recommendations Clause, Congress cannot compel the President to submit legislative proposals to Congress.").

We believe these longstanding views are sound. First, as we explain in Part II.A, it is in our judgment straightforward to conclude from the text of the Recommendations Clause—as well as from the Clause's purpose and longstanding practice—that Congress may not enact laws that purport to prohibit the President from carrying out his duty to recommend to Congress "such Measures as he shall judge necessary and expedient." Although this conclusion does not directly bear on the constitutionality of section 802, it provides important background for our later discussion. Second, as we explain in Part II.B, we believe that the Recommendations Clause also prevents Congress from enacting statutes that purport to direct the President to recommend legislation regardless of whether he judges it necessary and expedient. Such statutes would usurp the President's textually committed responsibility to "judge" that the "Measures" he recommends to Congress are "necessary and expedient," and for the bulk of the Nation's history Congress has refrained from enacting, or the Executive has resisted, laws of this kind.

## A.

We begin with the prohibition on muzzling laws, which we believe flows directly from the Clause's text. By providing that the President "shall" recommend to Congress "such Measures as he shall judge necessary and expedient," U.S. Const. art. II, § 3, the Recommendations Clause imposes a "duty" on the President to make such recommendations, George Washington, First Inaugural Address in the City of New York (Apr. 30, 1789), *reprinted in* 1 James D. Richardson, *A Compilation of the Messages and Papers of the Presidents* 51, 52 (1896); *see Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952) (stating that the Recommendations Clause assigns the President the "function[]" of "recommending . . . laws he thinks wise"). Laws that prevent the President from recommending legislation to Congress, even if the President judges such legislation necessary and expedient, would disable the President from carrying out that constitutionally assigned duty. Such laws therefore

contravene the plain text of the Clause. *See Zivotofsky ex rel. Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2094 (2015) (stating that a statute is "unlawful when it 'prevents the Executive Branch from accomplishing its constitutionally assigned functions'" (quoting *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 443 (1977))); *Schick v. Reed*, 419 U.S. 256, 266 (1974) (explaining that the pardon power "flows from the Constitution alone . . . and . . . cannot be modified, abridged, or diminished by the Congress").

The Clause's drafting history and evident purpose reinforce this straightforward textual construction. As originally proposed by the Committee of Detail at the Constitutional Convention, the Recommendations Clause stated that the President "*may* recommend . . . such measures as he shall judge necessary, and expedient." 2 Max Farrand, *The Records of the Federal Convention of 1787* at 185 (1911) ("Farrand") (emphasis added). On the floor of the Convention, however, Gouverneur Morris moved to amend the text to its present, mandatory form "in order to make it the *duty* of the President to recommend, & thence prevent umbrage or cavil at his doing it." *Id.* at 405; *see* James Madison, *Notes of Debates in the Federal Convention of 1787* at 526 (Norton re-issue 1987). The Convention approved the amendment without objection. 2 Farrand at 405. The Clause's drafters thus appear to have drafted the Clause to "squelch any congressional objections to the President's *right* to recommend legislation." *Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d 898, 908 n.7 (D.C. Cir. 1993). And as early commentators explained, the drafters chose to "requir[e]" the President to propose legislation in this manner because they believed that, "[f]rom the nature and duties of the executive department, he must possess more extensive sources of information . . . than can belong to congress," and so must be uniquely equipped "at once to point out the evil [that merits a legislative response], and to suggest the remedy." Joseph Story, *Commentaries on the Constitution of the United States* § 1555 (1833) ("Story"); *see Clinton v. City of New York*, 524 U.S. 417, 438 n.27 (1998) ("Art. II, § 3, enables the President 'to point out the evil, and to suggest the remedy.'" (quoting Story § 1555)).[2] Laws that prevent

---

[2] *See also* 1 St. George Tucker, *Blackstone's Commentaries: with Notes of Reference, to the Constitution and Laws, of the Federal Government of the United States; and of the Commonwealth of Virginia* app. at 344 (1803) ("Tucker") (explaining that "any inconveniences resulting from new laws, or for the want of adequate laws upon any subject, more immediately occur to those who are entrusted with the administration of the government,

the President from recommending legislation contradict this objective by denying him the "right to recommend legislation," and thus the ability to share with Congress his expertise and judgment concerning the need for new laws.

Historical practice lends further support to the conclusion that Congress may not forbid the President from recommending legislation. We have identified no law enacted in the first 120 years after the Constitution's ratification that purported to restrict the President's authority to recommend legislation he deems necessary and expedient. While it is possible that some laws of this kind were enacted, our research suggests that they were, at a minimum, uncommon. We have identified a handful of instances in the last century in which Congress has enacted such laws, but in those cases Presidents have consistently raised constitutional objections to, and refused to comply with, the laws at issue. In 1912, for instance, President Taft announced that he would not interpret an appropriations rider that purported to restrict the form and timing of the Executive Branch's budget requests to have "the effect of forbidding the President . . . to communicate to Congress recommendations as to expenditures and revenue," because such a restriction would "abridge the executive power in a manner forbidden by the Constitution." *Copy of Letter Sent by the President to the Secretary of the Treasury Relative to the Submission of a Budget to Congress* 5 (Sept. 19, 1912); *see* Act of Aug. 23, 1912, Pub. L. No. 62-299, § 9, 37 Stat. 360, 415. The following year, President Taft announced that he was submitting a budget recommendation in apparent defiance of the rider "pursuant to th[e] constitutional requirements" contained in the Recommendations Clause. 49 Cong. Rec. 3985 (Feb. 26, 1913). In 1966, President Johnson stated that he would construe as advisory a rider that purported to prohibit executive officers from using ap-

---

than to others, less immediately concerned therein"); William Rawle, *A View of the Constitution of the United States of America* 172 (2d ed. 1829) ("Rawle") ("[S]upplied by his high functions with the best means of discovering the public exigencies, and promoting the public good, [the President] would not be guiltless to his constituents if he failed to exhibit on the first opportunity, his own impressions of what it would be useful to do, with his information of what had been done."); Edward Dumbauld, *The Constitution of the United States* 311 (1964) ("The duty to furnish information and recommend measures to Congress makes it plain that it is not an officious intrusion upon the functions of the legislative branch, violative of the principle of separation of powers, when the President proposes a program of lawmaking to meet the needs of the nation.").

propriated funds to formulate particular budget requests because the rider "clearly intrude[d] upon the Executive function of preparing the annual budget." *Statement by the President Upon Signing the Department of Agriculture and Related Agencies Appropriations Bill* (Sept. 8, 1966), 2 Pub. Papers of Pres. Lyndon B. Johnson 980, 981 (1966); *see* Department of Agriculture and Related Agencies Appropriations Act, 1967, Pub. L. No. 89-556, tit. I, 80 Stat. 689, 690 (1966). In 1987, President Reagan objected to a provision enacted in 1985 and amended in 1987 that purported to bar the President's budget proposal from containing deficits in excess of a specified amount. *See* Balanced Budget and Emergency Deficit Control Reaffirmation Act of 1987, Pub. L. No. 100-119, § 106(f), 101 Stat. 754, 782; Balanced Budget and Emergency Deficit Control Act of 1985, Pub. L. No. 99-177, § 241(b), 99 Stat. 1038, 1063. The President said that this provision "must be viewed as merely precatory" in light of "the President's plenary power under [the Recommendations Clause] to submit to the Congress any legislation he deems necessary and expedient." *Statement on Signing the Bill to Increase the Federal Debt Ceiling* (Sept. 29, 1987), 2 Pub. Papers of Pres. Ronald Reagan 1096, 1097 (1987); *see also Statement on Signing the Omnibus Budget Reconciliation Act of 1990* (Nov. 5, 1990), 2 Pub. Papers of Pres. George Bush 1553, 1555 (1990) (raising a Recommendations Clause objection to a bill further amending this provision). And since 1998, each President has objected on Recommendations Clause grounds to, and indicated that he would construe as advisory, an annual appropriations rider purporting to withhold payment from any person who prepares or submits a budget request for certain programs based on the assumption that Congress will enact proposals for new "user fees."[3]

---

[3] *See Statement on Signing the Omnibus Appropriations Act, 2009* (Mar. 11, 2009), 1 Pub. Papers of Pres. Barack Obama 216, 217 (2009) (objecting to section 713 of the Agriculture, Rural Development, Food and Drug Administration, and Related Agencies Appropriations Act, 2009, Pub. L. No. 111-8, div. A, 123 Stat. 526, 555); *Statement on Signing the Consolidated Appropriations Act, 2004* (Jan. 23, 2004), 1 Pub. Papers of Pres. George W. Bush 126, 127 (2004) (objecting to section 721 of the Agriculture, Rural Development, Food and Drug Administration, and Related Agencies Appropriations Act, 2004, Pub. L. No. 108-199, div. A, 118 Stat. 4, 34); *Statement on Signing the Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999* (Oct. 23, 1998), 2 Pub. Papers of Pres. William J. Clinton 1843, 1848 (1998) (objecting to section 754 of the Agriculture, Rural Development, Food and Drug Administration, and Related Agen-

Moreover, as noted above, our Office has for decades consistently maintained that muzzling laws violate the Recommendations Clause. In 1955, for example, we objected to a bill that would have provided that "the estimated expenditures contained in the Budget for the fiscal year for which presented shall not exceed the estimated receipts during such fiscal year." H.R.J. Res. 346, 84th Cong. (1955). We indicated that this provision would violate the Recommendations Clause by removing the President's "absolute discretion as to the character of . . . recommendations he may choose to transmit" and "frustrat[ing] the President's responsibility of advising the Congress of the needs of the nation, the measures for fulfilling those needs, as his judgment dictates, and the required appropriations therefor." *Constitutionality of Joint Resolution*, 1 Op. O.L.C. Supp. at 161; *see supra* note 3. In 1961, the Office advised the Criminal Division that there would be "serious doubts as to the constitutionality" of 18 U.S.C. § 1913, a statute that restricts the use of federal funds to lobby Congress, if it were construed to "prevent the President or his subordinates from formally or informally presenting his or his administration's

---

cies Appropriations Act, 1999, Pub. L. No. 105-277, div. A, 112 Stat. 2681, 2681-33 to -34 (1998)); *see also Statement on Signing the Consolidated Appropriations Act, 2004*, 1 Pub. Papers of Pres. George W. Bush at 127 (2004) (also objecting on Recommendations Clause grounds to a separate provision, section 404 of the Transportation, Treasury, and Independent Agencies Appropriations Act, 2004, Pub. L. No. 108-199, div. F, 118 Stat. 279, 333, which provided that "[n]o funds made available by this Act shall be used to transmit a fiscal year 2005 request for United States Courthouse construction" that did not meet certain specified requirements).

We note that these user fee provisions—as well as the statutes to which President Reagan objected in 1987 and a bill to which our Office objected in 1955—purported only to prohibit the President from recommending certain measures as part of "the Budget" or "[t]he budget transmitted pursuant to" 31 U.S.C. § 1105(a). *E.g.*, Agriculture, Rural Development, Food and Drug Administration, and Related Agencies Appropriations Act, 1999 § 754; Balanced Budget and Emergency Deficit Control Act § 241(b); H.R.J. Res. 346, 84th Cong. (1955). Thus, these statutes may have left open the possibility that the President could recommend such measures through requests separate from his "[b]udget." Nonetheless, the Executive Branch treated each of these statutes as, at minimum, akin to muzzling laws, in that they purported to prohibit the President from including in his budget certain provisions he may have deemed "necessary and expedient." *See, e.g.*, *Statement on Signing the Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999*, 2 Pub. Papers of Pres. William J. Clinton at 1848 (1998) (stating that "[s]ection 754 of the Agriculture/Rural Development appropriations section constrains my ability to make a particular type of budget recommendation to the Congress" and so "would interfere with my constitutional duty under the Recommendations Clause").

views to the Congress . . . as to the need for new legislation." *Lobbying by Executive Branch Personnel*, 1 Op. O.L.C. Supp. at 246. And in 1966, the Office advised the Bureau of the Budget that the agriculture appropriations rider that President Johnson later stated he would construe as advisory was of "doubtful constitutionality" in view of the Recommendations Clause because it purported to "limit the President's authority . . . [to] formulat[e] a budget estimate in excess of a stipulated amount." Memorandum for the Files from Nathan Siegel, Office of Legal Counsel, *Re: Enrolled Bill; Department of Agriculture Appropriation Act for fiscal year ending June 30, 1967 (H.R. 14596)* at 2 (Sept. 1, 1966). The Office has raised similar objections on numerous occasions in the decades since.[4]

In sum, the plain language and apparent purpose of the Recommendations Clause, together with consistent and longstanding historical practice, all support the conclusion that the Clause prohibits Congress from enacting legislation that purports to bar the President from recommending legislative measures to Congress that he judges necessary and expedient.[5]

---

[4] *See, e.g.*, Letter for Lloyd Cutler, Counsel to the President, from Walter Dellinger, Assistant Attorney General, Office of Legal Counsel at 3–4 (July 20, 1994) (objecting to a provision of a trade bill that would have required the President "to forbear from transmitting legislation to implement [a] free trade agreement for at least sixty days after signing such an agreement"); Memorandum for Bruce C. Navarro, Acting Assistant Attorney General, Office of Legislative Affairs, from John O. McGinnis, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: S. 2411*, att. at 2 (June 6, 1990) (objecting to a provision of a trade bill that would have "prohibit[ed] the President from proposing decreases in duties on textiles, textile products, and nonrubber footwear"); Letter for James C. Miller III, Director, Office of Management and Budget, from John R. Bolton, Assistant Attorney General, Office of Legislative Affairs at 4 (Sept. 25, 1987) (advising that the budget restriction to which President Reagan objected in 1987 must be construed as precatory in light of the President's "unfettered discretion to submit any budget he wishes"); *see also Participation in Congressional Hearings During an Appropriations Lapse*, 19 Op. O.L.C. 301, 304 (1995) (stating that Congress's refusal to permit executive officials to participate in a congressional hearing is not unconstitutional "[s]o long as the President retains a means of making legislative recommendations").

[5] Although to our knowledge no court has disagreed with this conclusion, the D.C. Circuit stated in *Ass'n of American Physicians & Surgeons* that "the Recommendation Clause is less an obligation than a right," which the President "need not exercise . . . with respect to any particular subject or, for that matter, any subject." 997 F.2d at 908. To the extent that the court was suggesting that the Clause does not impose any duty on the President to recommend legislation, we respectfully disagree. As we have explained, the plain language of the Clause provides that the President "*shall* . . . recommend to [Con-

## B.

We next address laws that purport to require the President to propose legislation to Congress, regardless of whether the President judges such legislation necessary and expedient. The language of the Recommendations Clause does not expressly address such laws. But for the reasons explained below, we believe that the Clause's text, its purpose, and long-standing historical practice support the conclusion that such laws are unconstitutional.

## 1.

We begin, again, with the text of the Clause. As we have noted, the Clause imposes on the President a duty to "recommend to [Congress's] Consideration such Measures as he shall judge necessary and expedient." U.S. Const. art. II, § 3. By its plain terms, this duty has two parts: the President must "recommend to [Congress's] Consideration such Measures as . . . [are deemed] necessary and expedient," and he must "judge" which measures satisfy that standard. By imposing the latter responsibility, the Clause assigns to the President the "obligation to judge personally which recommendations should be made to Congress." *Authority to Enter Settlements*, 23 Op. O.L.C. at 160; *see id.* ("Through [the Recommendations Clause], the Constitution expressly commits the President to exercise his personal discretion in making legislative recommendations to Congress."). Laws purporting to compel the President to recommend legislation to Congress, regardless of whether the President judges the enactment of such legislation necessary or expedient, would prevent the President from fulfilling that obligation, by requiring the President to recommend

---

gress's] consideration such Measures as he shall judge necessary and expedient," and the Clause's drafters, as well as commentators dating to the Founding era, described it as imposing a "duty" or "requir[ement]" on the President. 2 Farrand at 405; Story § 1555; Rawle at 172. Nonetheless, we express no view on the D.C. Circuit's ultimate conclusion that the application of the Federal Advisory Committee Act ("FACA") to a presidential task force does not raise a serious constitutional question under the Recommendations Clause. *See Ass'n of Am. Physicians & Surgeons*, 997 F.2d at 908. Unlike the statutes discussed in this opinion, FACA does not purport to prohibit the President from recommending legislation, or require him to recommend legislation even if he does not judge it necessary and expedient, but instead contains publicity requirements that arguably affect the President's ability "to receive confidential advice on proposed legislation." *Id.* at 906.

legislation that he has not judged necessary and expedient. Moreover, such laws would effectively arrogate to Congress the authority to make that judgment, by requiring the President to recommend measures that Congress, and not the President, has judged necessary and expedient. These statutes would thus appear not only to "prevent[]" the President from carrying out his own "'constitutionally assigned function[],'" *Zivotofsky*, 135 S. Ct. at 2094, but also to enable "Congress in effect [to] exercise" that function, *id.* at 2095. In both respects these laws therefore appear to violate the Recommendations Clause. *See Section 609 of the FY 1996 Omnibus Appropriations Act*, 20 Op. O.L.C. 189, 195 (1996) (stating that Congress may neither "'prevent[] the Executive Branch from accomplishing its constitutionally assigned functions'" nor "attempt to exercise itself one of the functions that the Constitution commits solely to the Executive").

We recognize that the language of the Clause does not expressly state that the President has a duty to judge that *every* measure he recommends to Congress is "necessary and expedient." It does not provide, for instance, that the President shall recommend "*only* such Measures as he shall judge necessary and expedient." Accordingly, it could be argued that the Clause requires the President to recommend those measures he thinks necessary and expedient, but does not prohibit him from making other recommendations, including recommendations mandated by Congress. *See* Patricia A. Davis et al., Cong. Research Serv., RS22796, *Medicare Trigger* 5–6 (Feb. 8, 2016) (stating that the Clause does not "prevent Congress from directing the President to submit legislative recommendations" so long as it does not "prevent[] the President from submitting his own legislative proposal[s]" (emphasis omitted)). *But see id.* at 6 (stating that Congress may not "attempt[] to dictate the contents of a required legislative proposal").

In our view, however, this construction of the Clause is significantly less plausible than the one we have historically adopted. To start, the Recommendations Clause is the sole provision of the Constitution that addresses the President's authority and duty to make recommendations to Congress. It delineates with some specificity the type of measures the President shall recommend (those that are deemed "necessary and expedient"), and the officer who shall select those measures (the President). In contrast, no provision of the Constitution expressly empowers Congress to

require the President to recommend legislation. It is therefore reasonable to infer that the Recommendations Clause sets forth the sole circumstance in which the President may be required to recommend measures to Congress: when the President "judge[s] [them] necessary and expedient." U.S. Const. art. II, § 3.

Moreover, a number of other provisions in the Constitution are structured similarly to the Recommendations Clause—directing "such" action or result "as" a particular officer or entity determines is appropriate—and in each instance of which we are aware, the Supreme Court has construed such provisions to grant the named officer or entity exclusive authority to make the specified determination. The Court has said, for example, that the clause in Article II, Section 1 stating that "[e]ach State shall appoint, in *such* Manner *as* the Legislature thereof may direct, a Number of Electors," U.S. Const. art. II, § 1, cl. 2 (emphases added), leaves it "to the legislature *exclusively* to define the method of" appointing presidential electors, and so "operate[s] as a limitation upon the state in respect of any attempt to circumscribe the legislative power," as well as a barrier against "congressional and federal influence." *McPherson v. Blacker*, 146 U.S. 1, 25, 27, 35 (1892) (emphasis added). Similarly, the Court has held that Article III, in providing that "[t]he judicial Power . . . shall be vested in . . . *such* inferior Courts *as* the Congress may from time to time ordain and establish," U.S. Const. art. III, § 1 (emphases added), grants Congress "the *sole* power of creating the tribunals (inferior to the Supreme Court) for the exercise of the judicial power, and of investing them with jurisdiction either limited, concurrent, or exclusive, and of withholding jurisdiction from them," and thus prevents courts from "go[ing] beyond [a] statute, and assert[ing] an authority with which they may not be invested by it." *Cary v. Curtis*, 44 U.S. (3 How.) 236, 245 (1845) (emphasis added). The Court has given a similar construction to several other, comparably worded grants of authority in the Constitution.[6] These cases suggest that

---

[6] *See Wisconsin v. City of New York*, 517 U.S. 1, 19 (1996) (stating that the requirement that an "actual Enumeration [of each state's population] shall be made . . . in *such* Manner *as* [Congress] shall by Law direct," U.S. Const. art. I, § 2, cl. 3 (emphases added), "vests Congress with virtually unlimited discretion in conducting the decennial 'actual Enumeration'"); *Cook v. United States*, 138 U.S. 157, 182 (1891) (stating that the requirement that "when [a crime is] not committed within any State, the Trial shall be at *such* Place or Places *as* the Congress may by Law have directed," U.S. Const. art. III, § 2,

the Recommendations Clause, in granting the President authority to recommend "such Measures as he shall judge necessary and expedient," likewise assigns the President the "exclusive[]" or "sole" responsibility to decide which measures the President shall recommend to Congress.

This interpretation of the Clause also accords with the construction generally given other grants of authority in Article II. The Supreme Court and the Executive Branch have repeatedly concluded that where Article II assigns a duty to the President, the President alone has discretion to execute that duty, and Congress may not command the President to exercise that discretion in a particular circumstance. For example, the Attorney General has determined that the Appointments Clause, which provides that the President "shall nominate . . . Officers of the United States," U.S. Const. art. II, § 2, cl. 2, "leav[es] to the President . . . the designation of the particular individuals who are to fill [an] office," and so bars Congress from "control[ling] the President's discretion to the extent of compelling him to commission a designated individual." *Issuance of Commission in Name of Deceased Army Officer*, 29 Op. Att'y Gen. 254, 256 (1911); *see Pub. Citizen v. Dep't of Justice*, 491 U.S. 440, 483, 487 (1989) (Kennedy, J., concurring in the judgment) (similar). The Supreme Court has held that the Reception Clause, by providing that the President "shall receive Ambassadors and other public Ministers," U.S. Const. art. II, § 3, empowers "the President *alone* to receive ambassadors" and "recognize other nations," and accordingly prohibits Congress from "command[ing] the President to state a recognition position inconsistent with his own." *Zivotofsky*, 135 S. Ct. at 2085, 2095 (emphasis added). And this Office has concluded that the Take Care Clause, by providing that the President "shall take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, gives the Executive "exclusive authority to prosecute violations of the law," and so "gives rise to the corollary that neither the Judicial nor

---

cl. 3 (emphases added), "impose[s] no restriction as to the place of trial, except that the trial cannot occur until congress designates the place, and may occur at any place which shall have been designated by congress previous to the trial"); *Ex parte Siebold*, 100 U.S. 371, 397–98 (1879) (stating that the Appointments Clause, by providing that "Congress may by Law vest the Appointment of *such* inferior Officers, *as* they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments," U.S. Const. art. II, § 2, cl. 2 (emphases added), makes "the selection of the appointing power, as between the functionaries named, . . . a matter resting in the discretion of Congress").

Legislative Branches may . . . direct[] the Executive Branch to prosecute particular individuals." *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101, 115 (1984).

We think it follows from these Article II precedents that the Recommendations Clause likewise vests the President with "exclusive authority" to decide which measures he shall recommend to Congress. It is true, of course, that the ability to make recommendations to Congress—unlike the authority to nominate officers, receive ambassadors, or enforce the laws—is widely shared with other persons. *See Ass'n of Am. Physicians & Surgeons*, 997 F.2d at 908 ("Only the President can ensure that the laws be faithfully executed, but anyone in the country can propose legislation."). But the President's authority to judge which measures "[h]e"—that is, the President—"shall . . . recommend" to Congress is unique, and consequential, and vested by the Recommendations Clause in him alone. U.S. Const. art. II, § 3; *see supra* note 2 and accompanying text (discussing early commentators who observed that the President is uniquely well equipped to identify problems and propose remedial legislation). Under the Court's and the Executive Branch's precedents, Congress therefore may not attempt to control that authority by requiring the President to recommend particular measures to Congress.

## 2.

The evident purpose of the Recommendations Clause also supports this reading. As we have discussed, the Clause's drafters chose to obligate the President to recommend measures to Congress in order to ensure that Congress would benefit from the President's expertise and judgment concerning the need for new legislation. *See supra* note 2 and accompanying text. Commentators since the Founding era have offered several reasons why the President is uniquely equipped to facilitate "wise deliberations and mature decisions" by Congress, including that "any inconveniences resulting from new laws, or for the want of adequate laws upon any subject, more immediately occur to those who are entrusted with the administration of the government, than to others, less immediately concerned therein," 1 Tucker app. at 344; that "[t]he true workings of the laws" and "the defects in the nature or arrangements of the general sys-

tems [of industry and government] . . . are more readily seen, and more constantly under the view of the executive, than they can possibly be of any other department," Story § 1555; and that the President is "supplied by his high functions with the best means of discovering the public exigencies, and promoting the public good," Rawle at 172.

This objective would be at least partly undermined if the President could be compelled to recommend legislation that he did not "judge necessary and expedient." Such legislation would not reflect the President's expertise concerning "the want of adequate laws," 1 Tucker app. at 344, or his judgment as to "the best means of . . . promoting the public good," Rawle at 172. Yet the President would nonetheless be compelled to take steps that would promote the passage of that legislation. He would be required to devote the finite resources of the Executive Branch to formulating that legislation, rather than other laws he deemed necessary and expedient. Through his endorsement, he would be required to lend the legislation the prestige and weight of the Presidency. And the President would be required to falsely assert that he recommended that Congress enact such legislation, potentially causing members of Congress and the public to believe his support was genuine and in fact derived from his expertise and judgment—a result we do not think implausible, given that laws requiring the President to recommend legislation are sometimes buried in omnibus measures, and supporters of a bill would have little incentive to clarify that the President was speaking under compulsion. Rather than advancing "wise deliberations and mature decisions," such compelled recommendations would thus increase the likelihood that Congress would enact laws the President thought unnecessary or even detrimental to the public interest—a result contrary to the one the Clause was designed to achieve.

Furthermore, compelled recommendations of this kind could impair the President's ability to effectively recommend measures he *did* judge necessary and expedient. If, for example, Congress could require the President to recommend legislation advancing a particular aim, yet the President believed that legislation advancing a contrary aim was "necessary and expedient," the President would be compelled to submit two competing and inconsistent recommendations. The submission of two dueling recommendations would inevitably dilute the force and effectiveness of the President's true recommendation, and might well confuse some members

of Congress and the public. As a result, Congress would be less likely to discern the President's actual view regarding "[t]he true workings of the laws," Story § 1555, and "the best means of . . . promoting the public good," Rawle at 172, and the legislation the President judged necessary and expedient would be less likely to be enacted.

Indeed, for similar reasons, both the Supreme Court and the Executive Branch have recognized that where the Constitution assigns the President the affirmative authority to speak, it must also prohibit Congress—as "a matter of both common sense and necessity," *Zivotofsky*, 135 S. Ct. at 2095—from compelling the President to make statements with which he disagrees. Thus, in *Zivotofsky*, the Court held that because the President has the exclusive authority to make statements of diplomatic recognition, Congress may not "command the President to state a recognition position inconsistent with his own," even if that compelled statement "would not itself constitute a formal act of recognition." *Id.* "If the power over recognition is to mean anything," the Court explained, "it must mean that the President not only makes the initial, formal recognition determination but also that he may maintain that determination in his and his agent's statements." *Id.* at 2094–95. Similarly, the Executive Branch has long maintained that the President's "exclusive authority to conduct negotiations on behalf of the United States with foreign governments" implicitly precludes Congress from directing the President to engage in particular negotiations or take particular diplomatic positions, because such laws would prevent the United States from "speak[ing] with one voice." *Message to the Senate Returning Without Approval the Bill Prohibiting the Export of Technology for the Joint Japan-United States Development of FS-X Aircraft* (July 31, 1989), 2 Pub. Papers of Pres. George Bush 1042, 1043 (1989).[7] Here too, we think that the President's authority to recommend measures he thinks necessary and expedient "could be undermined," and the purpose underlying the Clause subverted, if Congress could require the President to "present[] a contradictory recommendation to Congress." *Authority to Enter Settlements*, 23 Op. O.L.C. at 161.

---

[7] *Cf. Wooley v. Maynard*, 430 U.S. 705, 714 (1977) (stating that because the First Amendment guarantees individuals "the right to proselytize religious, political, and ideological causes," it "must also guarantee the concomitant right to decline to foster such concepts").

### 3.

Historical practice, while not uniform, also generally supports the view that Congress cannot require the President to recommend legislation regardless of whether he judges that legislation necessary and expedient. We have not located any laws requiring the President to recommend legislation that were enacted by Congress during the first nearly 150 years after the Constitution's ratification.[8] It is of course possible that Congress enacted some laws of this kind, but (as before) our research suggests that they were, at minimum, uncommon during that period. Moreover, we have identified a number of statements from the same period suggesting that members of Congress interpreted the Recommendations Clause to vest the President with exclusive discretion to determine what measures he would recommend to Congress. For example, in 1835, Senator Benton proposed a resolution requesting that the President identify the appropriations necessary to purchase certain specified military items. Cong. Globe, 23d Cong., 2d Sess. 233 (Feb. 12, 1835). Senator Poindexter objected that it was improper to "make a call on any executive officer, any head of a department, for anything but facts," because the Recommendations Clause directed the President to "treat of these [appropriations] matters in his annual message to Congress, if he considered that they were deserving of notice," and the resolution was subsequently withdrawn. 11 Reg. Deb. 455–56 (Feb. 16, 1835). In 1865, when discussing a bill that would have required members of the Executive Branch to answer questions posed to them by Congress, Representative Morrill stated that the President "*alone* is made the judge of what information or measures are 'necessary and expedient' for him to communicate," and that members of Congress

---

[8] In 1789, Congress enacted a statute providing that "it shall be the duty of the Secretary of the Treasury to digest and prepare plans for the improvement and management of the revenue, and for the support of public credit." Act of Sept. 2, 1789, ch. 12, § 2, 1 Stat. 65, 65. This statute did not require any officer to make *recommendations* to Congress, much less recommendations of legislation. Indeed, the House of Representatives rejected language in a prior draft of the statute that would have required the President to "digest and *report* plans," 1 Annals of Cong. 592, 607 (June 25, 1789) (emphasis added), because members were concerned that directing the Secretary to report legislation to Congress would raise Origination Clause concerns, *see, e.g.*, *id.* at 593 (statement of Rep. Tucker) ("How can [a bill for raising revenue] originate in this House, if we have it reported to us by the Minister of Finance?").

therefore could not "bring the House to a direct vote upon the necessity and expediency." Cong. Globe, 38th Cong., 2d Sess. 422 (Jan. 25, 1865) (emphasis added).[9] And while these legislative proposals might themselves suggest that some members of Congress held a contrary view, we have not located any comparable statements, even by the bills' supporters, articulating a different view of the Recommendations Clause.

The Budget and Accounting Act, 1921, Pub. L. No. 67-13, 42 Stat. 20, might at first seem to be an example of a law, supported by both Congress and the Executive, that required the President to recommend legislation even if he did not think it necessary and expedient. Among other things, that legislation required the President to "transmit to Congress on the first day of each regular session, the Budget," which was to contain "[e]stimates of the expenditures and appropriations necessary in [the President's] judgment for the support of the Government for the ensuing fiscal year." *Id.* § 201(a) (codified as amended at 31 U.S.C. § 1105(a)(5)). President Wilson vetoed an earlier version of this legislation, but not on Recommendations Clause grounds, 50 Cong. Rec. 8609–10 (June 4, 1920), and President Harding subsequently signed it, 61 Cong. Rec. 2500 (June 13, 1921). Presidents since have attempted to meet its requirements.

On close examination, however, we do not believe that the Budget and Accounting Act supports the conclusion that Congress may require the President to recommend legislation. As an initial matter, because it is difficult to imagine a situation in which the federal government would not need funding legislation, it is not clear that the Executive Branch's general compliance with the Act suggests that it believes that Congress can *compel* it to propose legislation: the Act may simply represent a case in

---

[9] *See also, e.g.*, 71 Cong. Rec. 3975 (Sept. 26, 1929) (statement of Sen. Reed) (stating, in response to another Senator's complaint that the President had offered his views on a pending bill, that "[i]t is the plain meaning of th[e] language in the [Recommendations Clause] that it is for the President's judgment to settle the time and the subject of his recommendations"); 33 Cong. Rec. 980 (Jan. 19, 1900) (statement of Sen. Teller) (stating that "I have not any doubt that we have a right to call on the President for information," but that by virtue of the State of the Union and Recommendations Clauses "it is discretionary with him what he sends"); Cong. Globe, 30th Cong., 1st Sess., app. at 110 (Jan. 19, 1848) (statement of Rep. Hall) (arguing that the State of the Union and Recommendations Clauses entitle the President to "judge for *himself* the obligations of [his] duty" to "furnish [Congress] with information," and that Congress can "advise him, but [not] direct him . . . as to his proper course of conduct" (emphasis added)).

which Congress legislated procedures for recommending legislation—a budget of some form—that both the Executive and Congress agree will always be "necessary and expedient." Moreover, no provision of the Act required the President to recommend any legislation he did not believe "necessary and expedient." As we have noted, section 201(a) of the Act required the President to propose a budget containing "[e]stimates of the expenditures and appropriations *necessary in [the President's] judgment* for the support of the Government for the ensuing fiscal year" (emphasis added). This provision thus required the President to propose appropriations only if he deemed them "necessary," a requirement that is consistent with the President's constitutional duty to recommend legislation that "he shall judge necessary and expedient." U.S. Const. art. II, § 3; *see also* Budget and Accounting Act § 202(b) (codified as amended at 31 U.S.C. § 1105(c)) (stating that if the President's budget estimates a surplus, the President "shall make such recommendations *as in his opinion the public interests require*" (emphasis added)). Sections 202(a) and 203(b) of the Act required the President, in case of an estimated budget deficit, to "make recommendations to Congress for new taxes, loans, or other appropriate action to meet the estimated deficiency." Budget and Accounting Act §§ 202(a), 203(b) (codified as amended at 31 U.S.C. §§ 1105(c), 1107). But both provisions are open to the reading that the President could decline to "recommend[]" any "action" if he did not believe one was "appropriate," and both left the President free to propose actions other than legislation if he deemed them appropriate.[10]

In the middle of the twentieth century, Congress did begin to enact statutes requiring the President to recommend legislation of Congress's choosing. As far as we are aware, the Executive did not object to these requirements at first. In 1948, for example, Congress enacted a law requiring the President to "recommend to the Congress legislation with respect to the disposal of the Government-owned rubber-producing facilities." Rubber Act of 1948, Pub. L. No. 80-469, § 9(a), 62 Stat. 101, 105.

---

[10] We express no view on whether sections 202(a) and 203(b), to the extent that they are construed to require the President to propose *some* "appropriate action," are consistent with the Recommendations Clause or any other provision of the Constitution. We simply note that, even on that reading, they are not examples of laws requiring the President to recommend legislation.

The President raised no objection to this statute under the Recommendations Clause and appears subsequently to have complied with it. *See* Memorandum for the Attorney General from J. Lee Rankin, Assistant Attorney General, Office of Legal Counsel, *Re: R.F.C. Plan for Disposal of Government-owned Rubber-producing Facilities* (Apr. 8, 1953) (discussing the President's legislative recommendation pursuant to the Rubber Act). Over the succeeding three decades, Congress enacted numerous other laws requiring members of the Executive Branch to recommend specified legislation. *See, e.g.*, Clean Water Act of 1977, Pub. L. No. 95-217, sec. 72, § 516(e), 91 Stat. 1566, 1609; Federal Employees' Compensation Act Amendments of 1960, Pub. L. No. 86-767, sec. 209, § 35(b), 74 Stat. 906, 909; Act of Sept. 2, 1958, Pub. L. No. 85-861, sec. 2(A), § 123(b), 72 Stat. 1437, 1437; Act of June 19, 1951, Pub. L. No. 82-51, sec. 1(j), § 4(k)(7), 65 Stat. 75, 81–82. We are unaware of an instance from the 1950s through the 1970s in which the Executive Branch lodged an objection to this kind of requirement on Recommendations Clause grounds.

Beginning in 1981, however, the Executive began to object to such requirements. That year, our Office advised that "a statutory direction to the President to include any particular request in the budget he submits to Congress would be of doubtful constitutionality" under the Recommendations Clause. Memorandum for Robert A. McConnell, Assistant Attorney General, Office of Legislative Affairs, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, *Re: Section 108(a)(1) of H.R. 3499 as Revised in Conference*, att. at 1 (Oct. 9, 1981). In 1984, we explained to the Office of Management and Budget that we had "concluded on more than one occasion that bills that purport to require the President to submit specific budget proposals—notwithstanding his disagreement with them—would unconstitutionally infringe on the President's Art. II, § 3 power to make whatever legislative recommendations he deems appropriate." *Chicago School Case* at 18. Since then, each President has maintained that laws requiring the President to recommend legislation to Congress violate the Recommendations Clause and should be construed as advisory. *See, e.g.*, *Statement on Signing the Omnibus Appropriations Act, 2009*, 1 Pub. Papers of Pres. Barack Obama at 217 (2009); *Statement on Signing the Child Abuse, Domestic Violence, Adoption and Family Services Act of 1992* (May 28, 1992), 1 Pub. Papers of Pres.

George Bush 838, 838 (1992); *Statement on Signing the Military Construction Appropriations Act, Fiscal Year 1989* (Sept. 27, 1988), 2 Pub. Papers of Pres. Ronald Reagan 1230, 1230 (1988–89); *Presidential Signing Statements*, 31 Op. O.L.C. 23, 31 (2007) (observing that President George W. Bush objected to laws requiring the Executive to recommend legislation "in approximately 67 of his 126 constitutional signing statements" prior to January 26, 2007, and that his objections on the subject were "indistinguishable from President Clinton's"). And this Office has expressed the same view in several published opinions and numerous comments on bills pending in Congress.[11]

In sum, for nearly 150 years after the Constitution's ratification, Congress appears not to have enacted any law requiring the President to recommend legislation even if he did not judge that legislation necessary and expedient. And although for a few decades Congress did enact such laws without meeting resistance from the Executive, since 1981 the Executive has consistently maintained that laws of this kind are unconstitutional. On balance, then, historical practice confirms our view that the Recommendations Clause is best read to prohibit Congress from enacting laws that require the President to recommend legislation regardless of whether he judges it necessary and expedient.

### III.

Application of these principles to section 802 of the Medicare Modernization Act is straightforward. Section 802 does not prohibit the President from recommending legislation. But it does purport to require the President to recommend legislation regardless of whether he believes it is necessary and expedient. As noted above, section 802(a) added to 31 U.S.C. § 1105 a provision that reads:

---

[11] *See, e.g.*, *Authority to Enter Settlements*, 23 Op. O.L.C. at 160 (stating that the Clause "expressly commits the President to exercise his personal discretion in making legislative recommendations to Congress"); *Constitutional Issues Raised by Commerce, Justice, and State Appropriations Bill*, 25 Op. O.L.C. at 283 ("Under the Recommendations Clause, Congress cannot compel the President to submit legislative proposals to Congress."); *Presidential Signing Statements*, 31 Op. O.L.C. at 31 (stating that "the Constitution vests the President with discretion to [recommend legislation] when he sees fit").

> If there is a medicare funding warning under section 801(a)(2) of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 made in a year, the President shall submit to Congress, within the 15-day period beginning on the date of the budget submission to Congress under subsection (a) for the succeeding year, proposed legislation to respond to such warning.

31 U.S.C. § 1105(h)(1).

This provision is drafted in mandatory terms that do not permit the President to decline to "submit . . . proposed legislation" if he concludes that no such legislation would be necessary and expedient. Section 802 does not, for example, state that the President must submit "any" proposals for legislation, or submit proposals "as appropriate"—language that would permit him to decline to recommend measures that he does not judge necessary or expedient. *Cf., e.g.*, Medicare Modernization Act § 109(d)(2) ("Not later than June 1, 2006, the Secretary shall submit to Congress a report on the results of the study described in paragraph (1), including any recommendations for legislation."); 15 U.S.C. § 3117(b) ("The President shall recommend in the President's Budget, as appropriate, new programs or modifications to improve existing programs concerned with private capital formation."). Indeed, it is clear that section 802 requires the President to submit an actual proposed bill. The "proposed legislation" submitted by the President must be introduced in both houses of Congress, with the addition only of a title, within three legislative days after the President submits his proposal, and each House must then refer "[s]uch bill" to the appropriate committees for consideration. Medicare Modernization Act §§ 803(a)(1)–(2), 804(a)(1)–(2); *see id.* §§ 803(b)–(d), 804(b)–(e) (setting forth expedited procedures for consideration of bills to respond to a medicare funding warning).

Because section 802 requires the President to recommend that Congress enact legislation to respond to a medicare funding warning, regardless of whether the President judges any such legislation necessary and expedient, it falls squarely within the scope of our analysis above. We therefore conclude that section 802 violates the Recommendations Clause. As a result, it is permissible for the President to continue to treat section 802 as "advisory and not binding," FY 2010 Budget Submission at 197, as Presidents have done with similar requirements in the past, *see, e.g.*, *Statement on Signing the Military Construction Appropriations Act, Fiscal Year*

*1989*, 2 Pub. Papers of Pres. Ronald Reagan at 1230 (1988–89) (explaining that provisions purporting to "command the President" to recommend legislation "have been consistently treated as advisory, not mandatory").

## IV.

For the foregoing reasons, we conclude that section 802 of the Medicare Modernization Act contravenes the Recommendations Clause and may be treated as advisory and non-binding.

KARL R. THOMPSON
*Principal Deputy Assistant Attorney General*
*Office of Legal Counsel*
